UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
ICBC (LONDON) PLC,                                                      :  15 Civ. 0070 (LAK) (FM)
                                                                        :
                             Plaintiff,                                 :  **COUNTERCLAIMS**
                                                                        :
            -against-                                                   :
                                                                        :
THE BLACKSANDS PACIFIC GROUP, INC.,                                     :
                                                                        :
                             Defendant.                                 :
                                                                        :
------------------------------------------------------------------------X
                                                                        :
THE BLACKSANDS PACIFIC GROUP, INC. and                                  :
BLACKSANDS PACIFIC ALPHA BLUE, LLC,                                     :
                                                                        :
                             Counter-Plaintiffs                         :
                                                                        :
            -against-                                                   :
                                                                        :
ICBC (LONDON) PLC,                                                      :
                                                                        :
                             Counter-Defendant.                         :
                                                                        :
------------------------------------------------------------------------X

## THE PARTIES

1.      The Blacksands Pacific Group, Inc. ("Blacksands") is a Delaware corporation with its principal place of business in Los Angeles, California.

2.      Blacksands Pacific Alpha Blue, LLC ("Alpha Blue"), a subsidiary of Blacksands, is a Delaware limited liability company. Blacksands is the sole member of Alpha Blue.

3.      ICBC (London) plc is a British bank and financial institution with its principal place of business in London, United Kingdom.

## JURISDICTION AND VENUE

4. This Court has original subject-matter jurisdiction over these Counterclaims, under 28 U.S.C. §§ 1332 and 1441, on the ground of diversity of citizenship.

5. Pursuant to 28 U.S.C. 1332(a), this Court "shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . (2) citizens of a State and citizens or subjects of a foreign state . . . ."

6. Counter-Plaintiffs are not citizens of New York and Counter-Defendant is a citizen of the United Kingdom.

7. This Court also has supplemental jurisdiction over these Counterclaims, under 28 U.S.C. § 1367, because the Counterclaims "are so related to [Plaintiff's] claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

## FACTS

8. Blacksands is an international oil and gas corporation that, together with its subsidiaries, explores, produces, and sells crude oil, natural gas, natural gas liquids, and bitumen to customers in the United States and internationally. The company also engages in the trading and marketing of crude oil and petroleum products, and offers oilfield services.

9. In 2013, Blacksands and Alpha Blue began negotiating with Morgan Stanley regarding the issuance of a credit facility to support Blacksands' and Alpha Blue's planned purchase of an oil field in California.

10. Morgan Stanley offered to issue Blacksands and Alpha Blue a $500 million first-lien credit facility, subject to credit approval.

11. At or around that same time, Blacksands and Alpha Blue began negotiating with QInvest to obtain a bridge loan to ensure that Blacksands and Alpha Blue had adequate financing during the period before they closed on a credit facility with Morgan Stanley. QInvest offered to make a bridge loan of $20 million to Blacksands and Alpha Blue, which would be due a year after it was issued.

12. At or around that same time, Plaintiff also negotiated with Blacksands and Alpha Blue concerning Plaintiff's offer to issue a revolving credit facility to Blacksands and Alpha Blue that would be part of the financing structure for their acquisition of the California oil field.

13. Plaintiff agreed to issue a $70 million first lien pari passu revolving credit facility ("RCF") to Blacksands and Alpha Blue that included the $20 million Bridge Loan that would be made to Alpha Blue during the period before the RCF was issued.

14. The parties agreed that the RCF would be issued 90 days after the issuance of the Bridge Loan.

15. The parties also agreed that the Bridge Loan amount would be refinanced into the RCF and its lower rate of interest when the latter was issued.

16. That the Bridge Loan amount was intended to be refinanced into the RCF is confirmed by, among other things, an October 27, 2013 e-mail from Julian Madgett, Plaintiff's Head of Commodity and Structured Finance to Mike Kelly, Blacksands' Senior Vice President, Acquisitions, and Raheem Brennerman, Blacksands' Chairman and CEO and Manager of Alpha Blue, in which Mr. Madgett wrote: "[t]he $5m net bridge funds should be included as refinanced

by the main advance . . . ."

17.     Although the nominal amount of the Bridge Loan was $20 million, the parties actually intended that only $5 million would be disbursed to Alpha Blue.  The remaining $15 million was to be placed in a reserve account.

18.     Blacksands and Alpha Blue agreed to the Bridge Loan solely in reliance on Plaintiff's promise to issue the RCF, specifically, in reliance on Plaintiff's promise to issue the RCF within 90 days of the issuance of the Bridge Loan, and in reliance on Plaintiff's agreement to refinance the Bridge Loan into the RCF.

19.     Blacksands and Alpha Blue would not have agreed to the Bridge Loan in the absence of a promise by Plaintiff to issue the RCF.

20.     In reliance on Plaintiff's promise to issue the RCF, Blacksands and Alpha Blue developed a three-part capital financing structure for the acquisition of the California oil field: (i) $350 million first lien through another source; (ii) $70 million RCF offered by Plaintiff; and (iii) $275 million second lien credit facility through another source.

21.     Plaintiff was aware that Blacksands and Alpha Blue had developed a capital financing structure for the acquisition of the California oil field, and Plaintiff knew, or it was at least foreseeable to Plaintiff, that the acquisition could not go forward if Plaintiff did not fulfill its promise to issue the RCF.

22.     From November 13 through November 15, 2013, Julian Madgett, Plaintiff's Head of Commodity and Structured Finance exchanged a series of e-mails with Edwin Borrini, Plaintiff's counsel at Jones Day, confirming Plaintiff agreed to issue the RCF and Bridge Loan to Blacksands and Alpha Blue, and that the Bridge Loan would be refinanced into the RCF within

4

90 days of the Bridge Loan being issued ("November 15 E-mail Chain").

23.     Juliean Madgett sent Raheem Brennerman, the Chairman and CEO of Blacksands and Manager of Alpha Blue, blind-copy of the November 15 E-mail Chain in which Madgett instructed Jones Day how to draft the RCF and Bridge Loan agreements between Plaintiff and Blacksands and Alpha Blue, because the parties had already reached agreement that the Bridge Loan and RCF would be issued by Plaintiff to Blacksands and Alpha Blue, and what would be the essential terms of those loans; only the drafting of the agreements conforming to those terms was necessary before the loans could be issued.

24.     The e-mails in the November 15 E-mail Chain also show that Jones Day repeatedly asked Madgett whether the Bridge Loan and RCF were linked or were intended to be stand-alone loans, and that Madgett responded each time by stating that the RCF was linked to the Bridge Loan and that the documents should be drafted to reflect a single transaction between Plaintiff and Blacksands and Alpha Blue.

25.     On November 13, 2013, at 12:25 p.m. Jones Day e-mailed Madgett to confirm whether he understood correctly that Plaintiff viewed the two loans as independent (emphasis added): "1. [Plaintiff] will *definitely* provide a 90 [day] bridge facility in the amount of $5m as per the terms set out in 'Facility' of the current term sheet . . . 2. *Possible*, ICBC may provide further 5 year money (to be decided at later date) in amount of $70m which would be documented separately from, but rank pari passu with, the MS first lien piece."

26.     Less than an hour later, at 1:04 p.m. Madgett corrected Jones Day by stating that the Bridge Loan was intended to be refinanced into the RCF, and had been so offered to Blacksands and Alpha Blue: "The bridge is intended to turn into the separated tranche [*i.e.*, the

5

RCF] at better yield of the first lien capex-opex financing facility as pitched to the client – you were copied in."

27. On November 14, 2013, Jones Day again asked Madgett if the Bridge Loan and RCF were intended to be stand-alone. Madgett replied the next day, November 15, stating that the RCF and Bridge Loan were linked together, part of the same overall credit facility:"A NY law term loan facility agreement . . . [a] bilateral $20m (net $5m) 90 day Bridge to the Parent and then 5 yr part amortised Revolving Credit Facility (RCF) . . . ."

28. The November 15 e-mail from Madgett shows that the parties had reached agreement, including all essential terms, that Plaintiff would issue the Bridge Loan and RCF to Blacksands and Alpha Blue.

29. The stated purpose of the November 15 e-mail from Madgett, and the entire November 15 E-mail Chain, was for Plaintiff to apprise Jones Day of the terms of the agreement between Plaintiff and Blacksands and Alpha Blue for the Bridge Loan and RCF so that Jones Day could prepare an estimate of the amount it would charge to draft the necessary documents to effectuate the credit facility agreed to by the parties.

30. The November 15 e-mail confirms Plaintiff adopted the term sheet previously exchanged between the parties ("Term Sheet") that sets forth the essential terms of the agreement to issue the RCF: the loan size, length of loan, security, interest rate, and use of the loan proceeds.

31. The November 15 e-mail also contains instructions for Jones Day regarding the documents that it would have to prepare in order to issue the RCF.

32. On November 25, 2013, ten days after the November 15 E-mail was sent, the

Bridge Loan Agreement was fully drafted by Jones Day, in conformity with the essential terms the Term Sheet and as provided in the November 15 E-mail Chain, and the parties then executed that Agreement.

33. Other than the essential terms set forth on the Term Sheet, the provisions of the Bridge Loan Agreement were boilerplate language, *i.e.*, they were not negotiated but were language inserted by Jones Day, Plaintiff's attorney. In particular, Article 9 of the Bridge Loan Agreement, concerning the guaranty, was boilerplate language that was not negotiated by anyone at Blacksands or Alpha Blue.

34. On November 26, 2013, a conference call was held between Plaintiff and Alpha Blue, and their attorneys during which Plaintiff confirmed that it was going to issue the RCF, and Plaintiff directed its counsel, Jones Day, to provide a first draft of the RCF agreement by December 6—eleven days after the call.

35. When no draft RCF agreement was forthcoming in December 2013, Blacksands and Alpha Blue asked Plaintiff for a draft of the contract. Plaintiff did not respond to that request.

36. Blacksands and Alpha Blue continued to ask Plaintiff during January 2014 for a draft of the RCF agreement, but Plaintiff did not respond until February.

37. In January 2014, Alpha Blue repaid $10 million of the outstanding amount of the Bridge Loan.

38. On February 17, 2014, Goldleaf Jewelry announced that it was purchasing the California oil field at issue in this case.

39. In February 2014, Plaintiff informed Blacksands and Alpha Blue that Goldleaf

Jewelry—which, like Plaintiff, is a Chinese company—was interested in purchasing the California oil field.

40. Plaintiff indicated to Blacksands and Alpha Blue that it therefore might no longer be willing to issue the RCF to Blacksands and Alpha Blue, despite the parties' agreement.

41. Blacksands and Alpha Blue told Plaintiff that Goldleaf's interest wasn't Blacksands' and Alpha Blue's concern, as Blacksands and Alpha Blue had an agreement with Plaintiff for the RCF.

42. Plaintiff assured Blacksands and Alpha Blue that it would proceed with the RCF.

43. In reliance on Plaintiff's promise, Blacksands and Alpha Blue did not seek other financing. Blacksands and Alpha Blue, relying on Plaintiff's promise, continued to plan for the closing of the California oil field acquisition that would occur once Plaintiff issued the RCF.

44. Plaintiff, however, did not provide Blacksands and Alpha Blue with a draft of the RCF agreement or take any other steps to issue the credit facility.

45. As February 24, 2014, the original maturity date of the Bridge Loan, approached without Plaintiff issuing the RCF, the parties agreed that the maturity date would be extended so that Plaintiff could issue the RCF, and also so that Blacksands and Alpha Blue would have sufficient time to close on the overall entire capital financing structure for the California oil field acquisition. Plaintiff reiterated its intention to issue the RCF.

46. In April 2014, Bo Jiang, then Deputy Managing Director and acting CEO of Plaintiff, spoke with Brennerman of Blacksands and Alpha Blue multiple times about the RCF. Jiang asked Brennerman to explain the dispute between Plaintiff and Blacksands and Alpha Blue. He also asked if Blacksands and Alpha Blue still wanted the RCF financing; Brennerman said

yes. Jiang said he would look into the matter, and in the interim Plaintiff would extend again the maturity date of the Bridge Loan.

47.     Alpha Blue paid interest on the outstanding amount of the Bridge Loan during the period of December 2013 through May 2014, relying on Plaintiff's continued promises to issue the RCF.

48.     By the end of May 2014, however, Blacksands and Alpha Blue realized that Plaintiff was never going to issue the RCF despite its agreement to do so, and despite its promises earlier in 2014 that the RCF would issue. Blacksands and Alpha Blue also realized that Plaintiff had not intended to issue the RCF since at least when Plaintiff raised the potential Goldleaf Jewelry acquisition of the oil field with Blacksands and Alpha Blue, but likely before then. Plaintiff took no steps to issue the RCF at any point in 2014, despite its promises to do so. Instead, Plaintiff had determined it would not issue the RCF, but made promises to do so while Alpha Blue continued paying interest on the outstanding amount of the Bridge Loan.

49.     Because the capital financing structure that Blacksands and Alpha Blue had developed required that all of the components of the structure be issued in order for the California oil field acquisition to close, Plaintiff's failure to issue the RCF caused the entire capital structure to collapse, preventing Blacksands and Alpha Blue from completing the transaction to acquire the oil field in the first half of 2014.

50.     Blacksands and Alpha Blue therefore began to search for replacement financing for their acquisition of the California oil field.

51.     In June 2014, Jiang and Brennerman spoke again regarding the RCF. Brennerman told Jiang that it was apparent Plaintiff did not intend to issue the RCF, so Blacksands and Alpha

Blue had begun to search for replacement financing. Brennerman also told Jiang that Blacksands and Alpha Blue had incurred substantial costs as a result of Plaintiff's delay in issuing the RCF. Jiang told Brennerman that he understood Blacksands' and Alpha Blue's position, and that Plaintiff would extend the Bridge Loan's maturity date and waive any further payments of interest by Alpha Blue on the outstanding loan amount, and that Alpha Blue would not have to repay the outstanding amount of the Bridge Loan until Blacksands and Alpha Blue developed and closed on a new capital financing structure for the oil field acquisition.

52. Blacksands and Alpha Blue were able to develop an alternative capital financing structure by the beginning of December 2014. That new capital structure has not closed yet, but is expected to close soon.

53. In reliance on Plaintiff's agreement to issue the RCF, and its assurances thereafter to Blacksands and Alpha Blue that the RCF would be issued despite the delay, Alpha Blue did not repay the outstanding principal amount of the Bridge Loan, as Blacksands and Alpha Blue continued until May 2014 to expect that the remaining Bridge Loan amount would be refinanced into the RCF.

54. In reliance on Plaintiff's agreement to issue the RCF, and its promise thereafter to Blacksands and Alpha Blue that the RCF would be issued despite the delay, Alpha Blue was induced to continue paying interest on the outstanding amount of the Bridge Loan.

55. Blacksands and Alpha Blue also relied on the promise made by Bo Jiang, then acting CEO of Plaintiff, that the Bridge Loan did not need to be repaid—and further interest payments were waived—until after Blacksands and Alpha Blue developed a new capital financing structure to acquire the California oil field.

56.     Plaintiff's failure to issue the RCF has materially impeded Blacksands' and Alpha Blue's ability to close on their acquisition of the California oil field.

57.     Blacksands' and Alpha Blue's ability to close on that acquisition depends on them obtaining the requisite financing.

58.     As a result of the negotiations with Plaintiff, Blacksands and Alpha Blue ultimately created a capital financing structure that involved Alpha Blue assuming, as a first lien, a Bank Beal $350 million credit facility that had been issued to the current owner of the California oil field; Plaintiff providing the $70 million RCF; and Brova Consultadoria de Gestão, Unipessoal, Lda. providing a $275 Million second lien facility.

59.     Blacksands and Alpha Blue were ready to proceed with the assumption of the $350 Million first lien and the $275 Million second lien financing was committed, but Plaintiff's failure to issue the RCF caused the collapse of the capital financing structure.  The collapse of that structure caused Blacksands and Alpha Blue to incur significant costs while they developed new financing to enable them to proceed with the acquisition of the California oil field.

60.     As a result of Plaintiff's breach of the agreement to issue the RCF and its misrepresentations to Blacksands and Alpha Blue of its intention to issue the RCF, Blacksands and Alpha Blue have been damaged in the amount of at least $50 million.

61.      The damages include a substantial percentage, if not all, of the $500,0000 fee charged by Plaintiff to issue the Bridge Loan to Alpha Blue.  This fee was higher than would have paid for a stand-alone loan in the amount of the Bridge Loan; the fee was set at a high amount because Plaintiff also was going to issue the RCF.

62.     The damages also include $520,662.51, the total amount of the expenses that

Blacksands and Alpha Blue incurred in preparing the necessary paperwork and performing the requisite field work that had to be done in order to close on the deal to acquire the oil field using the capital financing structure that was supposed to include the RCF, and that Blacksands and Alpha Blue have incurred or will incur to re-do that work to close now on the oil field acquisition. That work must be redone when Blacksands and Alpha Blue close on the oil field acquisition using their new capital financing structure, as there have been significant changes to the oil field since the date that Blacksands and Alpha Blue were ready to close on the deal using the capital financing structure that was supposed to include the RCF.

63. The damages also include $377,837.80, the total amount of interest payments made on the outstanding amount of the Bridge Loan from December 2013 through May 2014.

64. $84,450.00, the amount of legal fees that Blacksands and Alpha Blue paid to Jones Day for the drafting the Bridge Loan Agreement.

65. The damages also include at least $50 million in Blacksands' and Alpha Blue's lost profits. During the negotiations with Plaintiff, Blacksands and Alpha Blue shared with Plaintiff a revenue analysis of the California oil field, which estimated that the profits in the year after a May 2014 closing would be well in excess of $50 million. The collapse of the capital financing structure that was supposed to include the RCF prevented Blacksands and Alpha Blue from acquiring the oil field by May 2014. Although Blacksands and Alpha Blue soon will close on the acquisition of the oil field, they have forever lost the profits that would have been earned if Plaintiff had fulfilled its promise to issue the RCF, thus permitting Blacksands and Alpha Blue to close on the oil field acquisition by May 2014.

## FIRST CAUSE OF ACTION
### (Breach of Preliminary Agreement)

66. Counter-Plaintiffs repeat and reallege the allegations in paragraphs 1-65 of these Counterclaims.

67. Counter-Defendant agreed to issue the Bridge Loan and RCF to Counter-Plaintiffs.

68. The communications between the parties, and the Term Sheet, reflect the parties' agreement and meeting of the minds on all of the essential terms of the of loans, as evidenced by the facts, among other things that, Counter-Defendant agreed to issue the RCF within 90 days of the issuance of the Bridge Loan, and that in November 2013 Counter-Defendant instructed its counsel, Jones Day, to draft the loan agreement for the combined Bridge Loan and RCF transaction to reflect the parties' agreement.

69. The parties thereafter executed the Bridge Loan, partially performing the agreement to issue the loans.

70. Counter-Defendant therefore entered into a preliminary agreement to issue the RCF to Counter-Plaintiffs

71. At the very least, Counter-Defendant and Counter-Plaintiffs entered into a preliminary agreement sufficient for Counter-Defendant to have incurred an obligation to negotiate in good faith toward the issuance of the $70 million RCF.

72. Counter-Defendant breached the preliminary agreement with Counter-Plaintiffs by failing to prepare the necessary paperwork, failing to complete negotiations in good faith, and failing to issue the RCF.

73. Counter-Plaintiffs were damaged by Counter-Defendant's breach of their preliminary agreement, in an amount to be determined at trial, but at least $50,000,000 plus interest.

## SECOND CAUSE OF ACTION
**(Promissory Estoppel)**

74. Counter-Plaintiffs repeat and reallege the allegations in paragraphs 1-73 of these Counterclaims.

75. Counter-Defendant promised to issue the RCF to Counter-Plaintiffs, knowing that Counter-Plaintiffs would rely on that promise.

76. Counter-Plaintiffs relied on Counter-Defendant's promise to issue the RCF, forgoing other loan opportunities that would have resulted in Counter-Plaintiff's closing on the acquisition of the oil field in the first half of 2014, developing a capital financing structure that relied on Counter-Defendant to issue the RCF before Counter-Plaintiffs could complete their acquisition of the California oil field, and incurring costs to complete the acquisition predicated on Counter-Defendant's issuance of the RCF.

77. Counter-Defendant knew that Counter-Plaintiffs were forgoing other loan opportunities, developing a capital financing structure that relied on Counter-Defendant to issue the RCF before Counter-Plaintiffs could complete their acquisition of the California oil field, and incurring costs to complete the acquisition predicted on Counter-Defendant's issuance of the RCF.

78. Counter-Defendant broke its promise and did not issue the RCF.

79. As a result of Counter-Defendant's promise and Counter-Plaintiffs' detrimental

reliance thereon, Counter-Plaintiffs were damaged in an amount to be determined at trial, but at least $50,000,000 plus interest.

## THIRD CAUSE OF ACTION
**(Unjust Enrichment)**

80. Counter-Plaintiffs repeat and reallege the allegations in paragraphs 1-79 of these Counterclaims.

81. Counter-Defendant repeatedly promised to Counter-Plaintiffs that it would issue the RCF.

82. In reliance on Counter-Defendant's promises, Counter-Plaintiff Alpha Blue did not repay the outstanding amount of the Bridge Loan, which Counter-Defendant had promised would be refinanced into the RCF.

83. In reliance on Counter-Defendant's promises, Counter-Plaintiff Alpha Blue continued paying interest on the outstanding amount of the Bridge Loan until May 2014.

84. The interest payments made by Counter-Plaintiff Alpha Blue were made at the interest rate provided in the Bridge Loan, LIBOR + 9.95%.

85. Counter-Defendant had agreed, however, to issue the RCF at an interest rate of LIBOR + 4.5%.

86. Had Counter-Defendant issued the RCF as it promised, and so refinanced the outstanding amount of the Bridge Loan into the RCF, the interest payments made by Counter-Plaintiff Alpha Blue would have been at the lower interest rate of LIBOR + 4.5%.

87. Counter-Defendant was unjustly enriched by its receipt of the interest payments made by Counter-Plaintiff Alpha Blue.

88.     Equity and good conscience require that Counter-Defendant repay to Counter-Plaintiff Alpha Blue all of the interest payments made since December 2013.

## FOURTH CAUSE OF ACTION
**(Fraudulent Misrepresentation)**

89.     Counter-Plaintiffs repeat and reallege the allegations in paragraphs 1-88 of these Counterclaims.

90.     Counter-Defendant made repeated material misrepresentations and false statements to Counter-Plaintiffs that Counter-Defendant would issue the RCF to Counter-Plaintiffs.

91.     Counter-Defendant made those material misrepresentations and false statements in an effort to induce Counter-Plaintiff to continue making interest payments to Counter-Defendant.

92.     Those material misrepresentations and false statements were knowingly false and/or contained material omissions, in that Counter-Defendant knew that it had no intention to issue the RCF.

93.     Counter-Defendant's material misrepresentations and false statements were made knowingly, intentionally, maliciously, wilfully, recklessly and with wanton disregard of the consequences.

94.     Counter-Plaintiff Alpha Blue justifiably relied on Counter-Defendant's representations and was fraudulently induced to make interest payments to Counter-Defendant.

95.     As a result of Counter-Defendant's material misrepresentations and false statements, Counter-Plaintiff Alpha Blue has been damaged in an amount to be determined at

trial, but no less than $377,837.80 plus interest.

**WHEREFORE** Counter-Plaintiffs demands that judgment be entered against Counter-Defendant as follows:

a.      On their First and Second Causes of Action, awarding them damages in an amount to be determined at trial, but no less than $50,000,000 plus interest;

b.      On their Third and Fourth, awarding them damages in an amount to be determined at trial, but no less than $377,837.80 plus interest; and

c.      Awarding costs, disbursements and such other and further relief to Counter-Plaintiffs as the Court may deem just and proper.

Dated:      New York, New York
              February 6, 2015

                                       KORNSTEIN VEISZ WEXLER
                                          & POLLARD, LLP


                                          By: s/ Kevin J. Fee
                                              Kevin J. Fee (KF-8818)
                                              Joel H. Rosner (JR-1776)
                                         757 Third Avenue
                                       New York, New York 10017
                                       (212) 418-8600
                                       kfee@kvwmail.com
                                       jrosner@kvwmail.com
                                       Attorneys for Defendant and Counter-Plaintiff
                                       The Blacksands Pacific Group, Inc. and
                                       Counter-Plaintiff Blacksands Pacific Alpha Blue LLC

TO:     Paul S. Hessler, Esq.
         Charles T. Pollak, Esq.
         LINKLATERS, LLP
         1345 Avenue of the Americas
         New York, New York 10105

Attorneys for Plaintiff