UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ICBC (LONDON) PLC,

                Plaintiff,

        -against-

THE BLACKSANDS PACIFIC GROUP, INC.,

                Defendant.
------------------------------------------------------------------X
THE BLACKSANDS PACIFIC GROUP, INC. and
BLACKSANDS PACIFIC ALPHA BLUE, LLC,

                Counter-Plaintiffs

        -against-

ICBC (LONDON) PLC,

                Counter-Defendant.
------------------------------------------------------------------X

15 Civ. 0070 (LAK) (FM)

**DECLARATION OF
RAHEEM J. BRENNERMAN**

      RAHEEM J. BRENNERMAN, under penalty of perjury, states as follows:

      1.    I am the Chairman and CEO of Defendant and Counter-Plaintiff The Blacksands Pacific Group, Inc. ("Blacksands") and the Manager of Counter-Plaintiff Blacksands Pacific Alpha Blue, LLC ("Alpha Blue"). I submit this Declaration in opposition to Plaintiff's Motion for Summary Judgment.

      2.    Blacksands is a Delaware corporation with its principal place of business in Los Angeles, California.

      3.    Alpha Blue, a subsidiary of Blacksands, is a Delaware limited liability company.

Blacksands is the sole member of Alpha Blue.

4. Blacksands is an international oil and gas corporation that, together with its subsidiaries, explores, produces, and sells crude oil, natural gas, natural gas liquids, and bitumen to customers in the United States and internationally. The company also engages in the trading and marketing of crude oil and petroleum products, and offers oilfield services.

5. In 2013, I began negotiating with Morgan Stanley, on behalf of Blacksands and Alpha Blue, regarding the issuance of a credit facility to support Blacksands' and Alpha Blue's planned purchase of an oil field in California.

6. Morgan Stanley offered to issue Blacksands and Alpha Blue a $500 million first-lien credit facility, subject to credit approval.

7. At or around that same time, I negotiated, on behalf of Blacksands and Alpha Blue, with QInvest to obtain a bridge loan to ensure that Blacksands and Alpha Blue had adequate financing during the period before they closed on a credit facility with Morgan Stanley. QInvest offered to make a bridge loan of $20 million to Blacksands and Alpha Blue, which would be due a year after it was issued.

8. At or around that same time, I negotiated, on behalf of Blacksands and Alpha Blue, with Plaintiff concerning Plaintiff's offer to issue a revolving credit facility to Blacksands and Alpha Blue that would be part of the financing structure for their acquisition of the California oil field.

9. Plaintiff agreed to issue a $70 million first lien pari passu revolving credit facility ("RCF") to Blacksands and Alpha Blue that included the $20 million Bridge Loan that would be made to Alpha Blue during the period before the RCF was issued.

10. The parties agreed that the RCF would be issued 90 days after the issuance of the Bridge Loan.

11. The parties also agreed that the Bridge Loan amount would be refinanced into the RCF when the latter was issued.

12. That the Bridge Loan amount was intended to be refinanced into the RCF is confirmed by, among other things, an October 27, 2013 e-mail from Julian Madgett, Plaintiff's Head of Commodity and Structured Finance to me and Mike Kelly, Blacksands' Senior Vice President, Acquisitions, in which Mr. Madgett wrote: "[t]he $5m net bridge funds should be included as refinanced by the main advance . . . ." The October 27, 2013 e-mail is attached as Exhibit 1.

13. The October 27, 2013 E-mail is the top e-mail in a longer chain, which has been redacted because the earlier parts of the chain contain Blacksand' and Alpha Blue's confidential and proprietary information, including nonpublic information regarding their plan for developing the California oil field. The redacted portion of the e-mail chain does not bear on the text quoted in ¶ 12 above.

14. Although the nominal amount of the Bridge Loan was $20 million, the parties actually intended that only $5 million would be disbursed to Alpha Blue. The remaining $15 million was to be placed in a reserve account.

15. I agreed to the Bridge Loan solely in reliance on Plaintiff's promise to issue the RCF, specifically, in reliance on Plaintiff's promise to issue the RCF within 90 days of the issuance of the Bridge Loan, and in reliance on Plaintiff's agreement to refinance the Bridge Loan into the RCF. I would not have agreed to the Bridge Loan in the absence of a promise by

Plaintiff to issue the RCF.

16. In reliance on Plaintiff's promise to issue the RCF, Blacksands and Alpha Blue developed a three-part capital financing structure for the acquisition of the California oil field: (i) $350 million first lien from another source; (ii) $70 million RCF offered by Plaintiff; and (iii) $275 million second lien credit facility from a third source.

17. Plaintiff was aware that Blacksands and Alpha Blue had developed a capital financing structure for the acquisition of the California oil field, and Plaintiff knew, or it was at least foreseeable to Plaintiff, that the acquisition could not go forward if Plaintiff did not fulfill its promise to issue the RCF.

18. Plaintiff adopted a term sheet we provided them ("Term Sheet") that sets forth the essential terms of the agreement to issue the RCF: the loan size, length of loan, security, interest rate, and use of the loan proceeds. The Term Sheet is attached as Exhibit 2.

19. The Term Sheet provided that the RCF would be issued at an interest rate of LIBOR + 4.5%. Id.

20. From November 13 through November 15, 2013, Julian Madgett, Plaintiff's Head of Commodity and Structured Finance exchanged a series of e-mails with Edwin Borrini, Plaintiff's counsel at Jones Day, confirming Plaintiff agreed to issue the RCF and Bridge Loan to Blacksands and Alpha Blue, and that the Bridge Loan would be refinanced into the RCF within 90 days of the Bridge Loan being issued ("November 15 E-mail Chain"). The November 15 E-mail Chain is attached as Exhibit 3.

21. I received the November 15 E-mail Chain from Julian Madgett, the sender of the top e-mail in the chain, who blind-copied me on that e-mail. Madgett copied me on his

communication to Plaintiff's attorney, in which Madgett instructed Plaintiff's attorney regarding how to draft the RCF and Bridge Loan agreements between Plaintiff and Blacksands and Alpha Blue, because the parties had already reached agreement that the Bridge Loan and RCF would be issued by Plaintiff to Blacksands and Alpha Blue, and what would be the essential terms of those loans; only the drafting of the agreements conforming to those terms was necessary before the loans could be issued.

22.     The e-mails in the November 15 E-mail Chain also show that Jones Day repeatedly asked Madgett whether the Bridge Loan and RCF were linked or were intended to be stand-alone loans, and that Madgett responded each time by stating that the RCF was linked to the Bridge Loan and that the documents should be drafted to reflect a single transaction between Plaintiff and Blacksands and Alpha Blue.  Ex. 3.

23.     On November 13, 2013, at 12:25 p.m. Jones Day e-mailed Madgett to confirm whether he understood correctly that Plaintiff viewed the two loans as independent (emphasis added): "1. [Plaintiff] will *definitely* provide a 90 [day]  bridge facility in the amount of $5m as per the terms set out in 'Facility' of the current term sheet . . . 2. *Possible*, ICBC may provide further 5 year money (to be decided at later date) in amount of $70m which would be documented separately from, but rank pari passu with, the MS first lien piece."  Ex. 3 at 7.

24.     Less than an hour later, at 1:04 p.m. Madgett corrected Jones Day, stating that  the Bridge Loan was intended to be refinanced into the RCF, and had been so offered to Blacksands and Alpha Blue: "The bridge is intended to turn into the separated tranche [*i.e.*, the RCF] at better yield of the first lien capex-opex financing facility as pitched to the client – you were copied in."  Ex. 3 at 6.

25. On November 14, 2013, Jones Day again asked Madgett if the Bridge Loan and RCF were intended to be stand-alone loans. Ex. 3 at 4.

26. Madgett replied the next day, November 15, stating that the RCF and Bridge Loan were linked together, part of the same overall credit facility: "A NY law term loan facility agreement . . . [a] bilateral $20m (net $5m) 90 day Bridge to the Parent and then 5 yr part amortised Revolving Credit Facility (RCF) . . . ." Ex. 3 at 1.

27. The November 15 e-mail from Madgett, the top e-mail in the November 15 E-mail Chain, shows that the parties had reached agreement, including all essential terms, that Plaintiff would issue the Bridge Loan and RCF to Blacksands and Alpha Blue. The November 15 e-mail also confirms that Plaintiff adopted the Term Sheet. Ex. 3 at 1-3.

28. The stated purpose of the November 15 e-mail from Madgett, and the entire November 15 E-mail Chain, was to apprise Jones Day of the terms of the agreement between Plaintiff and Blacksands and Alpha Blue for the Bridge Loan and RCF so that Jones Day could prepare an estimate of the amount it would charge to draft the necessary documents to effectuate the credit facility agreed to by the parties. Ex. 3 at 1, 4, 6, 7.

29. The November 15 e-mail also contains instructions for Plaintiff's counsel, Jones Day, regarding the documents that it would have to prepare in order to issue the RCF. Ex. 3 at 1-3.

30. On November 25, 2013, ten days after the November 15 E-mail was sent, the Bridge Loan Agreement was fully drafted by Jones Day, in conformity with the essential terms the Term Sheet and as provided in the November 15 E-mail Chain, and the parties then executed that Agreement. Ex. 3; Clark Affidavit Ex. A.

31.     Other than the essential terms set forth on the Term Sheet, the provisions of the Bridge Loan Agreement were boilerplate language, *i.e.*, they were not negotiated but were language inserted by Jones Day, Plaintiff's attorney.  In particular, Article 9 of the Bridge Loan Agreement, concerning the guaranty, was boilerplate language that was not negotiated with me or anyone else at Blacksands or Alpha Blue.

32.     On November 26, 2013, I participated in a conference call with Plaintiff and its attorneys regarding the RCF.  For Plaintiff, Julian Madgett and Benny Zacharia and an attorney from Jones Day were on the call.  During that call, Plaintiff confirmed that it was going to issue the RCF, and directed its counsel, Jones Day, to provide a first draft of the RCF agreement by December 6—eleven days after the call.

33.     When no draft RCF agreement was forthcoming in December 2013, Blacksands and Alpha Blue asked Plaintiff for a draft of the contract.  Plaintiff did not respond to that request.

34.     Blacksands and Alpha Blue continued to ask Plaintiff during January 2014 for a draft of the RCF agreement, but Plaintiff did not respond until February.

35.     In January 2014, Alpha Blue repaid $10 million of the outstanding amount of the Bridge Loan.

36.     On February 17, 2014, Goldleaf Jewelry announced that it was purchasing the California oil field at issue in this case.  *See* http://www.bloomberg.com/news/articles/2014-02-17/chinese-gold-retailer-to-pay-665-million-for-texas-oil-operator (last visited February 4, 2015).  A copy of the Bloomberg article is attached as Exhibit 4.

37.     In February 2014, Plaintiff's employee Julian Madgett informed me that Goldleaf

Jewelry—which, like Plaintiff, is a Chinese company—was interested in purchasing the California oil field. Madgett said that Plaintiff therefore might no longer be willing to issue the RCF to Blacksands and Alpha Blue, despite the parties' agreement.

38. I told Madgett that Goldleaf's interest wasn't Blacksands' and Alpha Blue's concern, as Blacksands and Alpha Blue had an agreement with Plaintiff for the RCF.

39. Madgett assured me that Plaintiff would proceed with the RCF. In reliance on Plaintiff's promise, I did not seek other financing for Blacksands and Alpha Blue. Blacksands and Alpha Blue, relying on Plaintiff's promise, continued to plan for the closing of the California oil field acquisition that would occur once Plaintiff issued the RCF.

40. Plaintiff, however, did not provide Blacksands and Alpha Blue with a draft of the RCF agreement or take any other steps to issue the credit facility.

41. As February 24, 2014, the original maturity date of the Bridge Loan, approached without Plaintiff issuing the RCF, the parties agreed that the maturity date would be extended so that Plaintiff could issue the RCF, and also so that Blacksands and Alpha Blue would have sufficient time to close on the overall entire capital financing structure for the California oil field acquisition. Plaintiff reiterated its intention to issue the RCF.

42. In April 2014, Bo Jiang, then Deputy Managing Director and acting CEO of Plaintiff, spoke with me multiple times about the RCF. Jiang asked me to explain the dispute between Plaintiff and Blacksands and Alpha Blue. He also asked if Blacksands and Alpha Blue still wanted the RCF financing; I told him yes. Jiang said he would look into the matter, and in the interim Plaintiff would extend again the maturity date of the Bridge Loan. In those conversations, Jiang never mentioned a notice of default sent on April 4, 2014, and I never

received the document attached as Exhibit D to the Clark Affidavit submitted in support of Plaintiff's Motion.

43.     Alpha Blue paid interest on the outstanding amount of the Bridge Loan during the period of December 2013 through May 2014, relying on Plaintiff's continued promises to issue the RCF.

44.     By the end of May 2014, however, I realized that Plaintiff was never going to issue the RCF despite its agreement to do so, and despite its promises earlier in 2014 that the RCF would issue.  I also realized that Plaintiff had not intended to issue the RCF since at least when Plaintiff raised the potential Goldleaf Jewelry acquisition of the oil field with Blacksands and Alpha Blue, but likely before then, because Goldleaf Jewelry would have had to have taken steps regarding the potential acquisition before February 17, when they announced it.  Instead, Plaintiff had determined it would not issue the RCF, but made promises to do so while Alpha Blue continued paying interest on the outstanding amount of the Bridge Loan.

45.     Because the capital financing structure that Blacksands and Alpha Blue had developed required that all of the components of the structure be issued in order for the California oil field acquisition to close, Plaintiff's failure to issue the RCF caused the entire capital structure to collapse, preventing Blacksands and Alpha Blue from acquiring the oil field in the first half of 2014.

46.     I therefore began to search for replacement financing for Blacksands' and Alpha Blue's acquisition of the California oil field.

47.     In June 2014, Jiang spoke with me again regarding the RCF.  I told Jiang that it was apparent Plaintiff did not intend to issue the RCF, so Blacksands and Alpha Blue had begun

to search for replacement financing.  I also told Jiang that Blacksands and Alpha Blue had incurred substantial costs as a result of Plaintiff's delay in issuing the RCF.  Jiang told me that he understood Blacksands' and Alpha Blue's position, and that Plaintiff would extend the Bridge Loan's maturity date and waive any further payments of interest by Alpha Blue on the outstanding loan amount, and that Alpha Blue would not have to repay the outstanding amount of the Bridge Loan until Blacksands and Alpha Blue developed and closed on a new capital financing structure for the oil field acquisition.

48.     Blacksands and Alpha Blue were able to develop an alternative capital financing structure by the beginning of December 2014.  That new capital structure has not closed yet, but is expected to close soon.

49.     In reliance on Plaintiff's agreement to issue the RCF, and its assurances thereafter to Blacksands and Alpha Blue that the RCF would be issued despite the delay, Alpha Blue did not repay the outstanding principal amount of the Bridge Loan, as Blacksands and Alpha Blue continued until May 2014 to expect that the remaining Bridge Loan amount would be refinanced into the RCF.

50.     In reliance on Plaintiff's agreement to issue the RCF, and its promise thereafter to Blacksands and Alpha Blue that the RCF would be issued despite the delay, Alpha Blue was induced to continue paying interest on the outstanding amount of the Bridge Loan.

51.     Blacksands and Alpha Blue also relied on the promise made by Plaintiff's acting CEO, Bo Jiang, that the Bridge Loan did not need to be repaid—and further interest payments were waived—until after Blacksands and Alpha Blue developed a new capital financing structure to acquire the California oil field.

52.     No one at Blacksands or Alpha Blue has ever acknowledged that Blacksands or Alpha owes any outstanding or accrued interest to Plaintiff.

53.     Based on my negotiations with Plaintiff, which led to the agreement to issue the RCF (and the Bridge Loan), Blacksands and Alpha Blue ultimately created a capital financing structure that involved Alpha Blue assuming, as a first lien, a Bank Beal $350 million credit facility that had been issued to the current owner of the California oil field; Plaintiff providing the $70 million RCF; and Brova Consultadoria de Gestão, Unipessoal, Lda. providing a $275 Million second lien facility.

54.     Blacksands and Alpha Blue were ready to proceed with the assumption of the $350 Million first lien and the $275 Million second lien financing was committed, but Plaintiff's failure to issue the RCF caused the collapse of the capital financing structure.  The collapse of that structure caused Blacksands and Alpha Blue to incur significant costs while they developed new financing to enable them to proceed with the acquisition of the California oil field.

55.     As a result of Plaintiff's breach of the agreement to issue the RCF and its misrepresentations to Blacksands and Alpha Blue of its intention to issue the RCF, Blacksands and Alpha Blue have been damaged in the amount of at least $50 million.

56.      That damage includes a substantial percentage, if not all, of the $500,0000 fee charged by Plaintiff to issue the Bridge Loan to Alpha Blue.  This fee was higher than would have paid for a stand-alone loan in the amount of the Bridge Loan; the fee was set at a high amount because Plaintiff also was going to issue the RCF.

57.     That damage also includes $520,662.51, the total amount of the expenses that Blacksands and Alpha Blue incurred in preparing the necessary paperwork and performing the

requisite field work that had to be done in order to close on the deal to acquire the oil field using the capital financing structure that was supposed to include the RCF, and that Blacksands and Alpha Blue have incurred or will incur to re-do that work to close now on the oil field acquisition. That work must be redone for Blacksands and Alpha Blue to close on the oil field acquisition using their new capital financing structure, as there have been significant changes to the oil field since the date that Blacksands and Alpha Blue were ready to close on the deal using the capital financing structure that was supposed to include the RCF.

58. That damage also includes $377,837.80, the total amount of interest payments made on the outstanding amount of the Bridge Loan from December 2013 through May 2014.

59. That damage also includes $84,450.00, the amount of legal fees that Blacksands and Alpha Blue paid to Jones Day for the drafting the Bridge Loan Agreement.

60. That damage also includes at least $50 million in Blacksands' and Alpha Blue's lost profits. During the negotiations with Plaintiff, Blacksands and Alpha Blue shared with Plaintiff a revenue analysis of the California oil field, which estimated that the profits in the year after a May 2014 closing would be well in excess of $50 million. Had Plaintiff issued the RCF, Blacksands and Alpha Blue could have closed on the oil field acquisition by May 2014. Plaintiff's failure to issue the RCF, however, caused the collapse of the capital financing structure that was supposed to include the RCF and prevented Blacksands and Alpha Blue from acquiring the oil field by May 2014. Although Blacksands and Alpha Blue soon will close on the acquisition of the oil field, they have forever lost the profits that would have been earned if Plaintiff had fulfilled its promise to issue the RCF, thus permitting Blacksands and Alpha Blue to close on the oil field acquisition by May 2014.

I declare under penalty of perjury that the foregoing is true and correct and that I executed this Declaration on February 6, 2015, in California.

_____
RAHEEM J. BRENNERMAN