UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

ICBC (LONDON) PLC,

                     Plaintiff,

        -against-

THE BLACKSANDS PACIFIC GROUP, INC.,

                     Defendant.

THE BLACKSANDS PACIFIC GROUP, INC. and
BLACKSANDS PACIFIC ALPHA BLUE, LLC,

                     Counterclaim-Plaintiffs,

        -against-

ICBC (LONDON) PLC,

                     Counterclaim-Defendant.

---------------------------------------------------------------x

15 Civ. 0070 (LAK) (FM)

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF COUNTERCLAIM-DEFENDANT ICBC (LONDON) PLC'S MOTION TO DISMISS COUNTERCLAIMS

Paul S. Hessler
Charles T. Pollak
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9000 Telephone
(212) 903-9100 Facsimile
paul.hessler@linklaters.com
charles.pollak@linklaters.com

*Attorneys for ICBC (London) plc*

March 6, 2015

The Blacksands Pacific Group, Inc. and Blacksands Pacific Alpha Blue, LLC (collectively, "**Blacksands**") do not adequately allege claims for breach of either a Type I or Type II preliminary agreement.[1]

The alleged Type I agreement, that ICBC (London) plc ("**ICBC**") would extend a five-year loan to Blacksands, fails because the Statute of Frauds bars the enforcement of an oral five-year loan agreement, and because the BLA[2] shows that there was no such agreement between the parties. The alleged breach of a Type II agreement fails because Blacksands does not allege (as it must) that it performed its part of such an agreement, and its allegations of "bad faith," required for a Type II claim, are so threadbare that the claim cannot survive a motion to dismiss. Nor do Blacksands' "alternative" claims for promissory estoppel, unjust enrichment, and fraudulent misrepresentation suffice to state a claim.

Perhaps the best illustration of the absurdity of Blacksands' counterclaims is its shallow and insulting speculation that ICBC "intended to favor a domestic Chinese company over Alpha Blue and Blacksands in a competition for acquisition of the California oil field." Opp. at 20. This accusation, supported by no facts whatsoever (indeed, ICBC (London) plc is an *English* company), is the sole basis for Blacksands' allegations of the "bad faith" required to plead a breach of the alleged Type II agreement, the "equity and good conscience" element of the unjust enrichment claim, and the "fraudulent intent" in the fraudulent misrepresentation claim. Accepting this rank speculation as sufficient would eviscerate even minimal pleading standards. Here, Blacksands does not even allege an agreement between ICBC and Goldleaf; it

---

[1] A "Type I" agreement is one where the parties have agreed to all necessary elements of the contract and are therefore bound; a "Type II" agreement is one where the parties have not settled all material terms, but have committed to negotiate in good faith to attempt to reach a final agreement within the scope settled in their preliminary agreement.

[2] Capitalized terms not otherwise defined herein are defined as in ICBC's Motion to Dismiss Counterclaims.

simply insinuates patriotic simpatico. It is akin to the "claims about little green men" that even the dissent in *Ashcroft v. Iqbal* exempted from the obligation to accept well-pleaded allegations as true. 556 U.S. 662, 696, 129 S. Ct. 1937, 1959 (2009).

## ARGUMENT

### I. BLACKSANDS DOES NOT ADEQUATELY ALLEGE THE EXISTENCE OR BREACH OF A TYPE II AGREEMENT

"To avoid trapping parties in surprise contractual obligations that they never intended," Type II agreements are enforceable only when the parties have come to an "overall agreement to enter into the binding contract." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989) (Type II agreement exists where parties have committed to negotiate in good faith to attempt to reach a final agreement within the preliminary agreement's scope). The Second Circuit sets forth five factors to judge a preliminary agreement's enforceability: (1) whether the agreement's language reveals the parties' intent to be bound; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. *See FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 229 (S.D.N.Y. 2009).

Two of these factors presume the existence of language for the Court to analyze, but, conclusory statements aside, Blacksands does not point to any document or conversation creating a Type II agreement. Blacksands, itself, acknowledges that none of the three exhibits in its Counterclaim[3] individually reflects such an agreement. Opp. at 17. And for good reason: two of the documents pre-date the BLA, which unequivocally disclaims the existence of any

---

[3] The three exhibits are: (i) an October 27, 2013 email between ICBC and Blacksands; (ii) an unsigned and undated "Memorandum for Discussion or Presentation" on Blacksands' Letterhead, entitled "Proposed $70m ICBC RCF (Revolver Credit Facility) Ranking Pari-Passu First Lien," which Blacksands refers to in its Counterclaims as a "Term Sheet;" and (iii) a November 15, 2013 email between ICBC and ICBC's attorneys at Jones Day discussing Jones Day's fee proposal for working on the BLA and the potential additional RCF. *See* Brennerman Decl. at Exs. 1-3; Counterclaims ¶¶ 16, 22-33, 68.

2

promises between the parties not set forth in the BLA itself. The remaining document, an unsigned and undated memorandum marked "for Discussion or Presentation," contains no language indicating binding intent. Neither the Counterclaims nor the Opposition identify any specific language reflecting an "intent to be bound," and Blacksands' conclusory allegations about such an agreement, *e.g.*, Counterclaims ¶¶ 13-15, are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949-50.

Although the second factor weighs in Blacksands' favor, as the BLA itself suggests that the parties agreed to negotiate the RCF in good faith (pursuant to the terms in the November 14 Letter), the remaining factors weigh in ICBC's favor. The third factor—the existence of open terms—is undoubted, as there are no documents setting out the full terms of the supposed promise. Although Blacksands asserts that the parties "partially performed" the RCF agreement by entering into the BLA, Counterclaims ¶ 69, Section 10.11 of the BLA ("**Section 10.11**") shows that the parties had not entered into any agreement (Type II or otherwise) regarding the RCF. The fifth factor—the necessity of putting the agreement in final form, with an eye on the customary form of such transactions—plainly favors ICBC. As demonstrated by the 73-page BLA governing ICBC's $20 million loan to Blacksands, $70 million dollar loans are generally papered in some form, rather than inferred from the shadows of hand-picked emails and dateless, unsigned memoranda "for discussion or presentation." Even agreements to agree are customarily documented in a binding letter of intent. Blacksands has not adequately alleged the existence of a Type II agreement.

In its Opposition, but not in its Counterclaims, Blacksands appears to point to Section 10.11 as the source of the alleged Type II agreement. Opp. at 8. While Section 10.11 obligates the parties to negotiate in good faith under certain specific terms, it is not a Type II

agreement, and must be considered in conjunction with and subject to the November 14 Letter which it incorporates by reference. *See* BLA § 10.11.

In determining whether parties to a preliminary agreement intend to be mutually bound, "there is a strong presumption against finding binding obligations in agreements which call for future approvals." *50 Pine Co. v. CapitalSource Fin. LLC (In re 50 Pine Co.)*, 317 B.R. 276, 282 (Bankr. S.D.N.Y. 2004) ("Disproportionate weight is accorded the first factor since it most clearly expresses the parties' intentions at the time of the preliminary agreement.") (quotations omitted). Here, the November 14 Letter's language—the "most important factor," *Arcadian*, 884 F.2d at 72—explicitly states ICBC had "sole discretion" over and "[f]inal approval" of the RCF.[4] Furthermore, the November 14 Letter merely "confirms" that ICBC "ha[d] approval" to provide the Bridge Loan and, in its sole discretion, the RCF; it does not bind ICBC. *See* November 14 Letter; *see also Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549 (2d Cir. 1998) (document was "entitled a 'proposal'" and "merely states that GAB 'desires' to purchase assets and sets forth GAB's offer"); *NRP Holdings LLC v. City of Buffalo*, No. 11-CV-472S (WMS), 2012 WL 2873899, at *6 (W.D.N.Y. July 12, 2012). The letter's plain language does not constitute an offer to provide the RCF, or state that Blacksands would be bound by an agreement upon delivery. *See, e.g., Highland Capital Mgmt. L.P. v. UBS Sec. LLC (In re Lyondell Chem. Co.)*, 505 B.R. 409, 416-17 (S.D.N.Y. 2014).

Because the November 14 Letter's language calls for future approvals and reserves "sole discretion" to grant that approval, this Court "need look no further than the first factor" to find that "intent can readily be determined by examining" the letter. *See Arcadian*, 884 F.2d at 72-73. The parties did not intend to be bound, and no Type II agreement exists. To the

---

[4] *See* November 14 Letter ("Final approval of the full terms of the Phase 2 First Lien Loan including Conditions Precedent to be at ICBC [sic] sole discretion subject to final review to be completed in good faith within the 90 day Bridge Loan maturity date.").

4

extent ICBC had any obligation to negotiate in good faith, this duty was limited in scope to the express terms of Section 10.11 and the November 14 Letter.

Even if Blacksands had adequately alleged a Type II agreement—which it has not—it does not adequately allege a breach. Under a Type II agreement, "a party may abandon the transaction as long as it has made a good faith effort to close the deal and has not insisted on conditions that do not conform to the preliminary writing." *Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 382 (S.D.N.Y. 2014). To determine whether a party has negotiated in good faith, courts consider a number of "generalizations," articulated in *Gas Natural*: (i) good faith requires "honesty in fact;" (ii) "self-interest is not bad faith," and bad faith requires acts "undertaken for reasons other than a good faith business judgment;" (iii) "bad faith requires some deliberate misconduct—arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment;" and (iv) the determination "necessarily depends upon the facts of the particular case," and "[w]hat good faith requires varies on a case-by-case basis." *Id.* at 382-83 (quotations omitted).

"Although the question of whether a party acted in good faith typically is not suitable for resolution on a motion to dismiss . . . courts have, on occasion, decided the issue at the pleading stage."[5] *Id.* at 383-84 (granting motion to dismiss because "shorn of its conclusory assertions, the Complaint simply fails to allege facts sufficient to state a plausible claim that Defendants acted in bad faith during their negotiations with Plaintiff") (quotations omitted). While courts generally consider plausible allegations as true for purposes of deciding a motion to dismiss, "*Twombly* and *Iqbal* require at least some assessment of whether the Complaint has alleged facts that 'nudge' an assertion that a party has acted in bad faith 'across the line from

---

[5]   Blacksands misleadingly quotes only half of this language, ignoring the crucial second clause. Opp. at 9.

conceivable to plausible.'" *Id.* at 383. As in *Gas Natural*, even assuming a Type II agreement, Blacksands' Counterclaims, "shorn of its conclusory assertions," fails to sufficiently allege facts stating a plausible claim that ICBC did not negotiate in good faith. *Id.* at 383-84.

Blacksands asserts that two allegations plausibly allege ICBC's bad faith: (i) that ICBC "might not want to conclude the RCF because Goldleaf Jewelry—like [ICBC], a Chinese company—was interested in buying the California oil field;" and (ii) that ICBC failed to produce the draft RCF. Opp. at 9-10. Blacksands' conclusory insinuation is that ICBC intentionally scuttled the alleged RCF because it learned that Goldleaf intended to purchase the same California oil field that Blacksands sought to buy with ICBC's financing, all because Goldleaf is a Chinese company.[6] Under any pleading standard, two unrelated Chinese companies' mere presence in the vicinity of a collapsed deal cannot suffice to allege "bad faith" by one of them.

Blacksands' allegations regarding Goldleaf are *the only alleged basis of ICBC's bad intent* in the Counterclaims. Without this motive, none of Blacksands' purported indicia of "bad faith" remotely approach the necessary pleading standard. This includes, for example, Blacksands' other primary allegation, regarding ICBC's failure to deliver a draft RCF. Stripped of any conspiratorial motive, ICBC's alleged delay in drafting the RCF is not dishonest, cannot be seen as "undertaken for reasons other than a good faith business judgment," and does not demonstrate deliberate misconduct. *See Gas Natural*, 33 F. Supp. 3d at 382-83.

Furthermore, if Section 10.11 created a Type II agreement, as Blacksands asserts in its Opposition (but not its Counterclaims), then Blacksands had its own obligations beyond waiting for ICBC to produce a draft of the RCF. Section 10.11 incorporates by reference the

---

[6] *See, e.g.*, Counterclaims ¶¶ 39 ("Goldleaf Jewelry – which, like [ICBC], is a Chinese company. . . ."), 48 (Blacksands "realized that [ICBC] had not intended to issue the RCF since at least when [ICBC] raised the potential Goldleaf Jewelry acquisition"); Opp. at 3, 10, 19, 20 ("What [ICBC] characterizes as an innocent remark seems at least as likely to be a tipping of its hand that it intended to favor a domestic Chinese company over Alpha Blue and Blacksands in a competition for acquisition of the California oil field. . . .").

6

terms of the November 14 Letter, which not only preserved ICBC's "sole discretion" to approve the RCF's final terms, but also contained a number of conditions precedent to any such financing,[7] which Blacksands does not and cannot allege that it satisfied within the time required.[8] This is fatal to its claim for breach of contract.[9]

## II.   BLACKSANDS DOES NOT ADEQUATELY ALLEGE THE EXISTENCE OF A TYPE I PRELIMINARY AGREEMENT

Nor does Blacksands adequately allege the existence or breach of a Type I agreement. As discussed in the MTD, New York's Statute of Frauds requires an agreement of this duration (five years) to be committed to writing and signed by the parties. Blacksands has not produced, and does not allege, any such written agreement. Blacksands' argument that the alleged *Type II* agreement is outside the Statute of Frauds because it was not "incapable of being performed within a year of its making," Opp. at 14-15, is inapplicable in the *Type I* context, regarding an alleged five year loan obligation. *See Carruthers v. Flaum*, 450 F. Supp. 2d 288, 308 (S.D.N.Y. 2006) (an alleged Type I agreement cannot be binding if it fails to satisfy the Statute of Frauds). "It goes without saying that the convoluted combination of drafts, signed letters of intent, oral representations and other 'promises' that [Blacksands] contends constitutes

---

[7] These include: including (i) a First Lien loan "provided by Morgan Stanley or another third party lender(s) *acceptable to ICBC*;" (ii) closure of a second lien loan and injection of additional equity by the Blacksands Group; and (iii) "Acquisition due diligence to be shared and *acceptable at ICBC* [sic] *discretion*." November 14 Letter (emphasis added).

[8] For example, Blacksands does not allege that it shared term sheets from other lenders, delivered acceptable due diligence (including audited accounts and independent assessment reports), or completed financing of the second lien loan. However, it now acknowledges that the BLA deadline was extended, in part, so that it "would have sufficient time to close on the overall capital financing structure for the California oil field acquisition." Opp. at 4.

[9] *See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (a plaintiff must prove its own adequate performance of the contract to plead a breach). The Court need not consider the emails attached to ICBC's motion, which show conclusively that Blacksands' key allegations are fabricated. *See* Hessler Decl. Exs. 2-7. The allegations themselves inadequately allege the "bad faith" necessary to sustain the claims for breach of a Type II agreement.

7

[its] entire contract is not the sort of arrangement that meets the requirements of the Statute of Frauds." *See id.* at 308.

Nor does the partial performance doctrine overcome the Statute of Frauds. *See* MTD at 13-14. Blacksands argues that its entry into the BLA was "unequivocally referable" to the alleged agreement to issue the RCF, because Blacksands otherwise would have accepted a bridge loan with another term.[10] Its argument ignores the central point: there are many reasons that Blacksands would have been interested in accepting a $5 million unsecured loan from ICBC, other than the alleged agreement to issue the RCF. The decision to enter into the BLA is not unequivocally referable to the purported RCF agreement. Any oral agreement is therefore void.

## III. BLACKSANDS' "ALTERNATIVELY PLEADED" COUNTERCLAIMS ARE NOT ADEQUATELY ALLEGED AND FAIL AS A MATTER OF LAW

### A. Promissory Estoppel

The Opposition abandons any promissory estoppel claim based on a promise to *negotiate* the RCF,[11] and asserts instead that its claim rests on ICBC's promise to *issue* the RCF. Opp. at 17-18. But Blacksands fails to allege a clear, unambiguous promise to provide funding, inducing reasonable and foreseeable reliance, causing injury sustained by reason of the reliance.

As set forth in the MTD, none of the three sources cited by Blacksands constitutes a "promise," much less a "clear and unambiguous" one. MTD at 15-16. Blacksands' only response is to assert that while none individually support its claims, collectively they do. Opp. at

---

[10] In light of the $50 million Blacksands claims it was damaged as a result of ICBC inducing it to extend the *three month* BLA, it is surprising that Blacksands considers a *one year* bridge loan a more favorable offer.

[11] Because the BLA, and the November 14 Letter incorporated therein, reserved to ICBC "sole discretion" whether to proceed with the RCF, such a claim could not survive. *In re 50 Pine Co.,* 317 B.R. at 285 (preliminary document reserving lender's option to decline to lend at its "sole discretion," "vitiate[s] any claims by the plaintiffs that the prospective lender had made a clear and unambiguous promise to lend or to negotiate in good faith."); *Cohen v. Lehman Bros. Bank, FSB,* 273 F. Supp. 2d 524, 530 (S.D.N.Y. 2003) (denying promissory estoppel claim alleging promise to bargain in good faith, where defendant reserved right to deny financing "at its sole discretion").

17. But because promissory estoppel requires "a distinct communication to be bound," *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 444 (S.D.N.Y. 2006), it is not enough to allege some non-specific, apparently subjective promise based on a group of documents. Blacksands cannot identify *any* such statement, so its claim fails. Further, any such statements, allegedly made prior to the BLA, directly contradict Section 10.11.

Blacksands also seeks to avoid the Statute of Frauds because, it says, it suffered "egregious and severe" injuries. Opp. at 17. Tacitly acknowledging that its claim cannot survive on the basis of lost profits or fees,[12] Blacksands cites instead the only alleged harm remaining: "exorbitant interest payments Plaintiff inappropriately induced Alpha Blue and Blacksands to make once Plaintiff decided to breach its promise to issue the RCF." Opp. at 17. But payment of $377,837 in contractually-agreed interest is not "unconscionable" by any standard. Opp. at 5-6. Blacksands' conclusory allegations state no claim. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

## B. Unjust Enrichment

Blacksands does not adequately allege a promise to deliver the RCF (*see supra*, part III.A). Even if such a promise were made, because the subject of the claim (paid interest) is governed by a valid written agreement (the BLA), Blacksands cannot state a claim for unjust enrichment. *Oorah, Inc. v. Schick*, 552 F. App'x 20, 23 (2d Cir. 2014) ("Unjust enrichment is a quasi-contractual claim; it exists only in the absence of a valid contract."). The BLA unambiguously provides for the payment of interest not just through the maturity date, but also for any time when the Borrower's obligations remain unsatisfied, including, as here, where the Borrower is in default. BLA §§ 2.7(c), 8.1(a). This rule is not limited to duplicative claims.

---

[12] *Mobile Data Shred, Inc. v. United Bank of Switz.*, No. 99 CIV. 10315, 2000 WL 351516, at *4 (S.D.N.Y. Apr. 5, 2000) (only "unconscionable" injury defeats Statute of Frauds, and "in the absence of 'egregious' circumstances, courts have consistently rejected promissory estoppel claims when the alleged injuries consisted of lost profits, lost fees, forgone business opportunities or damage to business reputation.").

9

Receipt of an entitlement under a written agreement that governs the subject matter cannot be "unjust." *Petrello v. White*, 412 F. Supp. 2d 215, 232 (E.D.N.Y. 2006) ("[O]ne who receives what he is entitled to under a contract may be enriched, but he is not unjustly enriched.").

### C.     Fraudulent Misrepresentation

Blacksands cites no case to support its fraudulent misrepresentation claim. It also does not contest that it (i) cannot repackage its contractual breach claim as a fraud claim; (ii) could not have been fraudulently induced into acts it already had contracted to perform; and (iii) could not have reasonably relied on any alleged misrepresentation. MTD at 20-22.

Moreover, the three facts that Blacksands relies upon for its fraudulent misrepresentation claim—that ICBC (i) failed to draft the RCF; (ii) expressed concern that Goldleaf intended to buy the oil field from under Blacksands; and (iii) extended the BLA's maturity date—are neither fraudulent, nor misrepresentations. *See also* MTD at 11 and n.7. ICBC had no duty to draft the RCF, and Blacksands' claimed reliance is unreasonable where it was fully within its own power to have drafted the RCF itself. MTD at 11 and n.7. Likewise, that ICBC did not fulfill an alleged promise to draft the RCF does not suggest fraudulent intent. Blacksands' ludicrous Goldleaf theory—that ICBC's concern "seems at least as likely to be a tipping of its hand that it intended to favor a domestic Chinese company" over Blacksands—is offensive and conclusory (*see supra,* part I). And ICBC's grant of a grace period does not indicate fraudulent intent. The extension and the collection of agreed interest are the subject not of fraud, but rather of a valid loan agreement. *See* MTD at 21-22.

### CONCLUSION

Nothing in the Counterclaims satisfies the minimum basic test of plausibility required by *Iqbal.* 556 U.S. at 678-79, 129 S. Ct. at 1949-50. For the foregoing reasons, Blacksands' counterclaims against ICBC should be dismissed in their entirety with prejudice.

Dated: New York, NY
March 6, 2015

Respectfully submitted,

Linklaters LLP

By: /s/ Paul S. Hessler
      Paul S. Hessler
      Charles T. Pollak
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9000
(212) 903-9100 (fax)

*Attorneys for ICBC (London) plc*

11