UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ICBC (LONDON) PLC,

                Plaintiff,

      -against-


THE BLACKSANDS PACIFIC GROUP, INC.,                15 Civ. 0070 (LAK)

                Defendant-Counterclaimant

      -and-

BLACKSANDS PACIFIC ALPHA BLUE, LLC,

                Additional Counterclaimant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION


Appearances:


        Peter S. Hessler
        Charles T. Pollack
        LINKLATERS
        *Attorneys for Plaintiff*


        Joel H. Rosner
        Kevin J. Fee
        KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
        *Attorneys for Defendant and Additional Counterclaimant*


LEWIS A. KAPLAN, *District Judge.*

This case arises out of a dispute between plaintiff ICBC (London) PLC ("ICBC"), a London-based bank, and Blacksands Pacific Group ("Blacksands"), a Delaware corporation engaged in oil and gas development. ICBC claims that Blacksands defaulted on a $5 million bridge loan. Blacksands alleges that ICBC breached an agreement to roll the bridge loan into a larger, longer-term financing structure. The matter is before the Court on ICBC's motion for summary judgment in lieu of complaint on its claim with respect to the bridge loan and its motion to dismiss Blacksands' counterclaims.

## Facts

### I.    Undisputed Facts

ICBC, Blacksands, and counterclaimant Blacksands Alpha Blue, LLC ("Alpha Blue"), a Blacksands subsidiary, entered into a bridge loan agreement ("BLA") on November 25, 2013.[1] Under the BLA, ICBC provided a $20 million, 90-day loan to Alpha Blue, which Blacksands absolutely and unconditionally guaranteed.[2] Of the available $20 million, Alpha Blue withdrew $5 million.[3] Neither Alpha Blue, as primary obligor, nor Blacksands, as guarantor, repaid the amount

---

[1]    DI 1, Ex. 6, at 3 (Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. in Lieu of Compl. under CPLR 3213).

[2]    *Id.*; BLA § 9.1. The BLA was attached as an exhibit to the Clark Affidavit in ICBC's original filing, but when the case was removed and docketed electronically, the BLA was split among four entries: DI 1, Ex. A Part 2 at 11-27; DI 1, Ex. A Part 3; DI 1, Ex. A Part 4; and DI 1, Ex. A Part 5 at 1-11. The Court will cite simply to the BLA for ease of reference. *See also* DI 13 ¶ 4 (Blacksands' Rule 56.1 Response to Plaintiff's Statement of Material Facts) (acknowledging formation of BLA).

[3]    DI 1, Ex. 6, at 5.

owed when it matured in February 2014.[4]  ICBC extended the deadline for repayment of principal

on two occasions, first to March 31, 2014, and later to July 31, 2014, while still collecting interest

payments.[5]  After each of these deadlines was missed, however, ICBC sent a notice of default to

Blacksands.[6]

II.      *Blacksands' Alleged Additional Facts*

Blacksands admits that it signed the BLA and that it has not paid its debt thereunder.

Instead, it contends that it should be relieved of its obligations under the BLA because the BLA was

but one part of a larger financial arrangement between Alpha Blue and ICBC.[7]  Specifically,

Blacksands alleges that the BLA was to serve as a 90-day bridge, the principal of which would roll

over into a 5-year, $70 million Revolving Credit Facility ("RCF").[8]  Blacksands intended the $70

million RCF to be part of a larger, $500 million capital structure that would fund Blacksands'

acquisition of an oil field in California.[9]  Thus, Blacksands says, it was not obligated to repay the

---

[4]      *Id.*; DI 13 ¶ 15.

[5]      DI 1, Ex. 6, at 5-6.

[6]      The first notice of default was sent on April 4, 2014 by fax, which Blacksands claims not to have received.  *See* DI 1, Ex. A Part 5, at 17-21 (April 4, 2014 Notice of Default); DI 1, Ex. A Part 5, at 13 (January 30, 2014 letter from Blacksands providing fax number); DI 13 ¶ 19 (Blacksands disputing receipt of April fax).  The second notice was sent by courier in August 2014, and Blacksands acknowledges receipt.  DI 13 ¶¶ 23, 25 (Blacksands acknowledging receipt of August 2014 Notice of Default).

[7]      DI 14 at 3 (Def.'s Opp'n to Mot. for Summ. J.).

[8]      *Id.*

[9]      *Id.* at 4.

4

bridge loan because it was understood by all parties that the principal would roll over into the RCF by the BLA's maturity date and the BLA's interest rate of LIBOR + 9.95 percent would be supplanted by the RCF's rate of LIBOR + 4.5 percent.[10]   Blacksands points to several pieces of evidence that it alleges created a binding contract obligating ICBC to issue the RCF: (1) an unsigned November 2013 term sheet; (2) a November 15, 2013 email exchange between ICBC and its counsel seeking an estimate to draft the BLA and a potential RCF; (3) and a November 26, 2013 conference call during which, Blacksands alleges, ICBC "confirmed that it was going to issue the RCF."[11]   In addition, Blacksands alleges that at least part of ICBC's motive for failing to issue the RCF is that ICBC learned in February 2014 that another buyer was interested in the same California oil field that Blacksands intended to purchase.[12]   Blacksands points out that both the second bidder on the oil field, Goldleaf Jewelry, and ICBC's parent company are Chinese-owned, though it does not allege any relationship between the companies.[13]

III.    *Procedural History*

ICBC initiated this lawsuit on December 8, 2014, in the Supreme Court of New York, New York County, to recover principal and interest allegedly owed by Blacksands under the BLA. The suit was filed under N.Y. CPLR § 3213, which permits plaintiffs suing to enforce instruments

---

[10]     *Id.*

[11]     *Id.* at 5.

[12]     DI 11 ¶¶ 38-42.

[13]     DI 11 ¶ 39.

5

for the payment of money only to move for summary judgment immediately in lieu of filing a complaint.  Blacksands removed the case to this Court on January 7, 2015. [14]  On February 6, 2015, it and its subsidiary, Alpha Blue, counterclaimed against ICBC, asserting claims for breach of contract, promissory estoppel, unjust enrichment, and fraudulent misrepresentation.[15]

The matter is pending before the Court on two ICBC motions: (1) a motion for summary judgment for the $5 million outstanding principal of the BLA, plus accrued interest and attorneys fees,[16] and (2) a Rule 12(b)(6) motion to dismiss all of the counterclaims.[17]

## Discussion

I.    *Motion for Summary Judgment*

A.    *Legal Standard*

"To establish a *prima facie* case of default on a promissory note under New York law, a plaintiff must provide proof of a valid note and of defendant's failure, despite proper demand, to make payment."[18]

---

[14]  DI 1 (Notice of Removal).

[15]  DI 13.

[16]  DI 1 Ex. 6.  As of November 2, 2014, Blacksands claims accrued interest of $304,055.96 and attorney's fees of $92,314.14.  DI 1, Ex. 6 at 6.

[17]  DI 24.

[18]  *Hack v. Stang*, No. 13 Civ. 5713, 2015 WL 5139128, at *2 (S.D.N.Y. Sept. 1, 2015) (citing *Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd.*, 117 F. Supp.2d 394, 399 (S.D.N.Y.2000)); *see also Customers Bank v. Anmi, Inc.*, No. 11 Civ. 07992, 2012 WL 6629100, at *2 (S.D.N.Y. Dec. 20, 2012); *Cooperatieve Centrale Raiffeisen Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 491 (2015).

6

In an action against a guarantor, a plaintiff must show "the existence of the guaranty, the underlying debt and the guarantor's failure to perform under the guaranty."[19]  The burden then shifts to the defendant to raise a "triable issue of fact in the form of a bona fide defense against the note."[20]

### B.    *ICBC Has Established Its* Prima Facie *Case*

Blacksands does not contest the validity of the BLA itself, pursuant to which it "absolutely, unconditionally, and irrevocably guarantee[d]" the loan to Alpha Blue.[21]  Moreover, the BLA explicitly states that Blacksands, as guarantor, acknowledges the guaranty to be an "instrument for the payment of money" and that ICBC therefore had the right, in the event of default, to proceed under CPLR § 3213.[22]  ICBC has established also that it sent a notice of default by courier in August 2014.[23]  Lastly, Blacksands does not dispute that it has not repaid the principal it borrowed under

---

[19]

*Cooperatieve Centrale Raiffeisen Boerenleenbank, B.A.*, 25 N.Y.3d at 492.

[20]

*Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp.2d 462, 470 (S.D.N.Y. 2006) (quoting *Nat'l Union Fire Ins. Co. v. Keenan*, No. 93 Civ. 6784, 2005 WL 736233, at *1 (S.D.N.Y. Mar. 31, 2005)).

[21]

BLA § 9.1.

[22]

BLA § 9.8.

[23]

Indeed, ICBC alleges also that it sent a faxed notice in April 2014 to the contact number provided by Blacksands.  DI 1, Ex. A Part 5, at 17-21 (April 4, 2014 Notice of Default); DI 1, Ex. A Part 5, at 13 (January 30, 2014 letter from Blacksands providing fax number).  Blacksands does not dispute the authenticity or validity of the fax or confirmation page submitted by ICBC, nor does it allege that ICBC sent the notice to an incorrect or otherwise defective fax number.  Nonetheless, Blacksands alleges, without any supporting facts or explanation, that it did not receive the notice of default.  DI 13 ¶ 19.  It is well settled that a party "must do more than simply show that there is some metaphysical doubt as to the

the BLA nor that it has ceased to make interest payments in the amounts called for by the BLA.[24]
Accordingly, ICBC has established its *prima facie* case for default on a promissory note.

     C.     *Blacksands Fails to Raise a Triable Issue of Fact*

        The burden thus shifts to Blacksands to raise a triable issue of fact on a *bona fide*
defense.  It has attempted to do so by arguing that the BLA should not be read in isolation, but rather
as part of a broader agreement to provide a long-term financing mechanism that Blacksands intended
to use to purchase an oil field in California.[25]  In other words, Blacksands argues, it signed the BLA
only because of ICBC's assurances that it would issue the RCF shortly thereafter.  In its submission,
it therefore is not in breach of the BLA because ICBC breached the larger financing agreement.[26]

        Unfortunately for Blacksands, the plain language of the BLA contradicts its
argument.  As discussed above, Blacksands "absolutely, unconditionally and irrevocably"guaranteed
the loan to Alpha Blue.[27]  It agreed also that it would "immediately be liable" for full payment if

---

material facts" to defeat summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.*, 475 U.S. 574, 586 (1986).  Because Blacksands has provided no specifics to call the
validity of the fax into question, the Court assumes that the notice of default was sent as
ICBC claims.  Regardless, for present purposes, this dispute is immaterial because
Blacksands acknowledges receipt of the August 21, 2014 demand letter.  DI 13 ¶¶ 23, 25.

[24]

DI 13 ¶¶ 21, 26-27; *see also* DI 14 at 15 ("The $5 million Bridge Loan remains outstanding
because Plaintiff breached the agreement for the $70 million RCF.").

[25]

*See, e.g.*, DI 13 ¶ 26; DI 14, at 3-7; DI 11 ¶¶ 27-49 (Blacksands' Counterclaims).

[26]

DI 14 at 3-4.

[27]

BLA § 9.1.

Alpha Blue failed to pay in full.[28]  Significantly, while the BLA explicitly contemplated further loans to Blacksands, it nevertheless provided merely that the parties would "enter into and continue good faith negotiations of additional financing arrangements."[29]  It further incorporated by reference a November 14, 2013 letter, which stated that "[f]inal approval" of any additional financing arrangements was at ICBC's "sole discretion subject to final review to be completed in good faith within the 90 day Bridge Loan maturity date."[30]  None of this language imposed any obligation on ICBC to issue an RCF.  At most, as discussed below, it obligated ICBC to negotiate in good faith with a view to concluding additional funding arrangements.

Next, the BLA contains an integration clause, stating that the BLA is the "entire understanding among the parties" and "supersede[s] any prior agreements."[31]  Thus, even if there were a prior agreement to issue the RCF – which, as discussed below, there was not – the BLA would have supplanted it.  In fact, Blacksands itself, in its opposition to ICBC's motion to dismiss the counterclaims, seems to acknowledge that the BLA and RCF were separate, rather than intertwined, agreements.  In arguing that ICBC was obligated to issue the RCF, Blacksands states that:

> "Plaintiff conflates the parties' dispute over repayment of the Bridge Loan with the parties' agreement for Plaintiff to provide the RCF.  While the [BLA] does contain a maturity date and an integration clause for that particular piece of the parties'

---

[28]

    *Id*.

[29]

    BLA § 10.11.

[30]

    BLA § 10.11; DI 21, Ex. 1 (Decl. Of Robert Clark in Supp. of Pl.'s Mot to Dismiss Countercl.).

[31]

    BLA § 10.12.

financing arrangements, that is, the Bridge Loan, this is not relevant to the parties' agreement for Plaintiff to provide additional financing in the form of the RCF."[32]

Blacksands is correct on this point – whether there was an agreement for the RCF is a wholly separate question from whether Blacksands' is in breach of its obligations under the BLA.

*Camofi Master LDC v. College Partnership, Inc.*[33] is instructive.  In that case, as here, two contracts were at issue: a $500,000 bridge loan from Camofi to College Partnership, and a broader Banking Agreement with Duncan Capital under which Duncan was to secure (on behalf of College Partnership) not only the bridge loan, but also long-term financing and other funding sources.[34]

Duncan did secure the bridge loan, but failed to find long-term financing.[35]  When College Partnership failed to repay the principal on the bridge loans, Camofi sued.[36]  The court rejected College Partnership's fraudulent inducement defense, in part because it concluded that the bridge loans and the banking agreement were separate contracts, not intertwined as College Partnership contended.[37]  In making this determination, the court emphasized that the two agreements were executed at different times and that the banking agreement explicitly stated that

---

[32]

DI 28 at 19-20.

[33]

452 F. Supp.2d 462 (S.D.N.Y. 2006).

[34]

*Id.* at 466.

[35]

*Id.*

[36]

*Id.*

[37]

*Id.* at 475.

the bridge loans would be executed in a separate document.[38]

As in *Camofi*, we here have two agreements – assuming for the moment that the RCF, in fact, was a binding agreement – that were executed at separate times.  The BLA was signed on November 23, 2013.  The RCF, according to Blacksands, was made final either by a November 15, 2013 email chain, or by a subsequent teleconference on November 26, 2013.  Furthermore, the BLA, far from incorporating the RCF, expressly contemplated that negotiations on further financing were ongoing, and thus, presumably, would result in a separate contract in the event those discussions bore fruit.

Blacksands further argues that ICBC "agreed to waive interest payments and extend Alpha Blue's time to repay the Bridge Loan until after Alpha Blue and Blacksands developed and obtained funds from a new capital financing structure for the acquisition of the California oil field."[39]  This waiver was made, according to Blacksands, in a telephone conversation between the chief executive officer of Blacksands and the then-chief executive officer of ICBC.[40]  Even if this were true, however (and Blacksands has offered no competent, admissible proof that it is), it would be  immaterial because the BLA provides that it cannot be altered except by "written agreement between the Lender and the Obligors."[41]  Therefore, neither the fact of the alleged conversation, assuming it occurred, nor its alleged substance would raises a genuine issue of *material* fact because

---

[38]

    *Id.*

[39]

    DI 13 ¶ 27.

[40]

    DI 12 ¶ 47 (Brennerman Declaration).

[41]

    BLA § 10.2.

such an oral promise would have been ineffective to modify the BLA.

> D.      *Blacksands Waived Its Right to Raise Defenses*

The parties disagree about whether Blacksands' absolute and unconditional guaranty served also to waive its right to assert any defenses to the guaranty.

It is settled law in New York that the parol evidence rule does not bar evidence showing fraud in the inducement or execution of an agreement, despite the existence of a merger and integration clause.[42]  However, where a contract's disclaimers go beyond boilerplate integration clauses and specifically disclaim that the contract was made in reliance on the type of representations later claimed to have been fraudulent, a defense of fraud may be barred.[43]  This specificity principle has been extended to cover absolute and unconditional guaranties, where the guaranty is stated to be absolute and unconditional even where the underlying loan is not otherwise valid or is subject to defenses.[44]

In *Citibank, N.A. v. Plapinger*,[45] the plaintiff banks sued a bankrupt corporation's officers to collect unpaid loans to the corporation.  The officers had guaranteed the loans, assuming

---

[42]

*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320 (1959);

[43]

*Id.* at 320-21.

[44]

*Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 96 (1985); *see also Camofi Master LDC*, 452 F. Supp. 2d at 477 ("College Partnership's fraud defense . . . also fails because the plaintiff specifically waived his right to protest payment of the Notes. By the terms of the Notes, College Partnership pledged that "[e]ach payment of principal and of interest shall be paid . . . without setoff or counterclaim."  Under New York law, such a waiver among sophisticated parties is effective to overcome virtually any defense to enforcement." (citations omitted)).

[45]

66 N.Y.2d 90 (1985).

personal liability in the event the corporation defaulted, but claimed that they were told fraudulently by the banks that their corporation would be extended a further line of credit if the officers signed as guarantors.[46]   The court held that defendants were barred from raising a defense of fraud because "the 'absolute and unconditional' nature of their guarantee was 'irrespective of (i) any lack of validity * * * of the * * * Restated Loan Agreement * * * or any other agreement or instrument relating thereto', or '(vii) any other circumstance which might otherwise constitute a defense' to the guarantee."[47]   The court stressed that this went beyond a general "boilerplate exclusion" and followed extended negotiations among sophisticated business people for a multimillion dollar personal guaranty.[48]   The court observed that it would be "unrealistic in such circumstances to expect an express stipulation that defendants were not relying on a separate oral agreement to fund an additional multimillion dollar line of credit."[49]

As in *Plapinger*, we have here a strongly worded guaranty that states, in relevant part:

> "The obligations of the Guarantor . . . are absolute and unconditional, irrespective of the value, validity or enforceability of the obligations of the Borrower under this Agreement . . . and irrespective of any other circumstance which might otherwise constitute a legal or equitable discharge or defense in favor of the Guarantor or the Borrower (other than payment in full of the Obligations), it being the intent of this Section 9.2 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances."[50]

---

[46]
    *Id.* at 92-94.

[47]
    *Id.* at 95.

[48]
    *Id.*

[49]
    *Id.*

[50]
    BLA § 9.2.

13

Further, this was an agreement negotiated by sophisticated business entities, both of which were advised by counsel who were involved in negotiating, drafting, and reviewing the agreement.[51]

The cases cited by Blacksands are unavailing.  In *Manufacturers Hanover Trust Co. v. Yanakas*,[52] the court found that *Plapinger* did not bar the defense of fraud, citing three main distinctions.  First, the court found that, unlike in *Plapinger*, the exclusion clause was "boilerplate" on a preprinted form rather than the product of negotiation between the parties.[53]  Second, the court found that the guaranty "contain[ed] no disclaimer as to the validity, regularity, or enforceability of the Guarantee itself."[54]  Third, it found "no blanket disclaimer of the type found in *Plapinger* as to 'any other circumstance which might otherwise constitute a defense' to the Guarantee."[55]  None of these distinctions, however, is present in this case, nor does Blacksands point to any others.

The other cases cited by Blacksands are equally unavailing because they stand for the principle that *counterclaims* cannot be barred by waiver clauses such as the one at issue here, while defenses may be so barred.[56]

---

[51]

BLA § 1.6.

[52]

7 F.3d 310, 316 (2d Cir. 1993).

[53]

*Id.* at 317.

[54]

*Id.*

[55]

*Id.*

[56]

*See* DI 14 at 13-18 (citing, *inter alia*, *Nat'l Westminster Bank USA v. Ross*, 676 F. Supp. 48 (S.D.N.Y. 1987); *MCC Funding LLC v. Diamond Point Enterprises, LLC*, 36 Misc. 3d 1206(A), 954 N.Y.S.2d 760 (Sup. Ct. 2012) (unreported disposition)).

*E.  Fraud in the Inducement*

Blacksands argues that summary judgment is inappropriate because it needs discovery on, among other topics, ICBC's intentions regarding the RCF and when it formed those intentions, its intentions behind extending the BLA's maturity date, and its intentions to "thwart the closing on the . . . financial structure Blacksands created so as to enable Goldleaf to acquire the property."[57]  Though Blacksands does not clearly articulate the relevance of this inquiry, the Court assumes it is intended to lay the groundwork for a defense of fraud in the inducement.

The first problem with this argument is that the Federal Rules of Civil Procedure govern here notwithstanding that this action was removed from a state court.[58]  Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."[59]  This requires that:[60]

> a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing "'(1) what facts are sought [to

---

[57]  DI 14 at 12.

[58]  The state cases upon which Blacksands relies here therefore are entirely inapposite.

[59]  Rule 56(d) reflects stylistic revisions of former Rule 56(f) that were not intended to make any substantive change.  *E.g.,* Adv. Comm. Notes to 2007 and 2010 amendments to Rule 56 and Rule 56(d), respectively.  Cases decided under former Rule 56(f) therefore remain fully authoritative.

[60]  *Gurary v. Winehouse*, 190 F.3d 37, 43-44 (2d Cir. 1999).  *Accord, e.g.*, *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003); *Boomer v. Goord,* 283 F. App'x 855, 857-58 (2d Cir. 2008) (summary order); *Haran v. Dow Jones & Co.*, 216 F.3d 1072, 2000 WL 777982, at *3 (2d Cir. June 15, 2000) (summary order); *Feingold v. Hankin*, 91 Fed. App'x 176, 177 (2d Cir. 2004) (summary order).

resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.'" *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir. 1995) (quoting *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir. 1989)); *accord, Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir. 1994); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir. 1985). Indeed, the failure to file such an affidavit is fatal to a claim such as plaintiff makes here even if the party resisting the motion for summary judgment alluded to a claimed need for discovery in a memorandum of law. *Paddington Partners,* 34 F.3d at 1137.

Blacksands' failure to submit to submit a Rule 56(d) affidavit or declaration alone is sufficient to defeat its discovery argument. And the vague argument in its memorandum of law, even if it had been made in affidavit or declaration form, would not have satisfied all the requirements of the rule. For one thing, Blacksands effectively waived any claim for fraud in the inducement for reasons discussed above. In consequence, it has failed sufficiently to show not only what evidence it would pursue through discovery but, even more importantly, how that evidednce, if secured in discovery, would raise a genuine issue of material fact.[61] In short, the claim that summary judgment is premature in advance of discovery simply does not defeat ICBC's motion.

## II.      *Motion to Dismiss Counterclaims*

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts

---

[61] The elements for fraud in the inducement are: "(1) a misrepresentation of an existing material fact; (2) made with knowledge of its falsity; and (3) with an intent to defraud; (4) that induces reasonable reliance; and (5) damages the defendant." *Camofi Master LDC*, 452 F. Supp.2d at 474. The elements for fraudulent misrepresentation are: "(1) misrepresentation of a material fact; (2) scienter; (3) justifiable reliance; and (4) injury or damages." *P. Chimento Co. v. Banco Popular de Puerto Rico*, 208 A.D.2d 385, 385, 617 N.Y.S.2d 157, 158 (1st Dept. 1994). Though the elements vary slightly in form, in substance they are identical.

"to state a claim to relief that is plausible on its face."[62]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[63]  The Court accepts as true all well pleaded factual allegations and "draw[s] all inferences in the plaintiff's favor."[64]

Blacksands[65] asserts four counterclaims against ICBC on which it claims a total of over $50 million in damages,[66] and ICBC has moved to dismiss all four.[67]  The Court examines each *seriatim*.

## A.    *First Cause of Action: Breach of Preliminary Agreement*

Blacksands pleads breach of a preliminary agreement on two alternative theories. first, it alleges breach of a binding Type I preliminary agreement to issue the RCF. Second, it claims breach of a Type II preliminary agreement to negotiate in good faith towards issuance of the RCF.[68]

---

[62]

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[63]

*Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[64]

*Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotation marks and citation omitted).

[65]

Blacksands is joined in all four counterclaims by its subsidiary Alpha Blue, the primary obligor under the BLA but which was not joined as a defendant.  For ease of reading, for purposes of this section, references to "Blacksands" should be understood to refer collectively to Blacksands and Alpha Blue.

[66]

*See generally* DI 11.

[67]

DI 24.

[68]

DI 11 ¶¶ 66-73.

*1.      Breach of Alleged Type I Agreement*

In New York, "[t]he hallmark of a Type I agreement is that the parties have agreed to all necessary elements of the contract and are, therefore, bound to the ultimate objective despite the fact that a more formal or elaborate writing has yet to be produced."[69]  However, to avoid binding parties unjustly when, in truth, no agreement has been finalized, "'[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents.'"[70]

Four factors are relevant to determining whether a binding Type I agreement has been formed:[71]

> (1) whether there is an expressed reservation of the right not to be bound in the absence of a writing;

> (2) whether there has been partial performance of the contract;

> (3) whether all of the terms of the alleged contract have been agreed upon; and

> (4) whether the agreement at issue is the type of contract that is usually committed to writing.

The BLA itself squarely addresses the first factor, "which is frequently the most important" factor.[72]  As noted above, the BLA stated that the parties would "enter into and continue good faith negotiations of additional financing arrangements."  Further, it incorporated by reference

---

[69]

      *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005) (citing *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)).

[70]

      *Brown*, 420 F. 3d at 154 (quoting *Adjustrite Sys., Inc.*, 145 F.3d at 548).

[71]

      *Id.*

[72]

      *Id.*

the November 14, 2013 letter, which stated that "[f]inal approval" of any additional financing arrangements would be at ICBC's "sole discretion subject to final review to be completed in good faith within the 90 day Bridge Loan maturity date."[73]  This demonstrates the parties' express agreement that there was no obligation to issue the RCF, only an obligation to negotiate in good faith towards additional financing.  Blacksands offers no coherent rebuttal to this point.

Blacksands next contends that it partially performed the RCF agreement by signing the BLA.[74]  This is explicitly contradicted by the BLA's integration clause, however, which states that the BLA is the "entire understanding among the parties" and "supersede[s] any prior agreements."[75]  As discussed above, the BLA stands on its own as a full, independent contract.

Blacksands argues also that the parties had agreed "on all of the essential terms of the loans."[76]  It points to a November 2013 term sheet printed on Blacksands letterhead and the November 15, 2013 email chain in which ICBC sought its counsel's estimate for drafting both the BLA and the RCF.[77]  However, neither of these documents was signed by ICBC, which did not otherwise indicate a desire to be bound by the terms on the Blacksands proposed term sheet.

The final factor – whether this is the type of agreement that is usually committed to writing – also supports ICBC.  Not only is this agreement of a sort that normally is committed to

---

[73] BLA § 10.11; DI 21, Ex. 1 (Decl. Of Robert Clark in Supp. of Pl.'s Mot to Dismiss Countercl.).

[74] DI ¶ 69.

[75] BLA § 10.12.

[76] DI 11 ¶ 68.

[77] DI 28 at 16.

writing, but under New York law it *must* be.  The New York Statute of Frauds requires that any agreement that cannot be completed within one year be memorialized in a writing signed by the party against whom it is sought to be enforced.[78]  Blacksands alleges that the agreement was for a five-year Revolving Credit Facility.  Neither Blacksands' own term sheet, which never was signed or acknowledged by ICBC, nor the email between ICBC and its counsel, was sufficient to create an enforceable agreement.[79]

The part performance exception to the Statute of Frauds does not save Blacksands here.  "The doctrine of part performance may be invoked only if plaintiff's actions can be characterized as unequivocally referable to the agreement alleged. [T]he actions alone must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement."[80]  Blacksands claims that its signing of the BLA cannot be understood other than as part of the overall agreement for the RCF.  As discussed above, however, Blacksands' signing of the BLA and the interest payments it made thereunder can be fully understood within the context of the BLA itself without any reference to the RCF.  It is perfectly conceivable – and indeed happens every day – that a borrower takes out a short-term bridge loan without any expectation that the bridge loan will be part of a larger, long-term financing arrangement, let alone part of such an arrangement with the bridge loan lender.  The mere fact that there were negotiations for additional financing is insufficient to raise a genuine issue of fact as to whether the signing of the BLA was "unequivocally referable"

---

[78]

N.Y. GOL § 5-701.

[79]

*See Bronner v. Park Place Entm't Corp.*, 137 F. Supp.2d 306, 311 (S.D.N.Y. 2001) ("[I]t is . . . well established that unsigned writings prepared by a plaintiff, without more, do not suffice to bind a defendant.").

[80]

*Id.* at 312.

to any broader agreement.

### 2.       *Breach of Alleged Type II Agreement*

Although a Type I agreement is fully binding as to all material elements of the underlying contract, a Type II agreement is not.  It merely obligates the parties to negotiate in good faith toward a final agreement.[81]  Doubtless seeing the flaws in its claim of breach of a Type I Agreement, Blacksands argues in the alternative that there was "[a]t the very least" a breach of a Type II agreement.[82]

The relevant factors to determine whether there was a valid Type II agreement are:[83]

(1) whether the intent to be bound is revealed by the language of the agreement;

(2) the context of the negotiations;

(3) the existence of open terms;

(4) partial performance; and

(5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

Here, the first factor weighs towards finding a Type II agreement.  As previously discussed, the BLA expressly bound the parties to enter into good faith negotiations.

The second factor also weighs towards finding a binding Type II agreement.  As the BLA again demonstrates, both parties were aware that Blacksands was interested in negotiating

---

[81]     *Brown*, 420 F.3d at 157.

[82]     DI 11 ¶ 71.

[83]     420 F.3d at 157.

additional financing arrangements beyond the BLA.[84]  Although, as noted above, the issuance of the RCF was not an obligation, the context was one in which all parties acknowledged that the BLA might be merely the first of multiple financial deals struck among the parties.

The third factor – the existence of open terms – does not weigh against finding a binding agreement.  In fact, "these same omissions may actually support finding a binding Type II agreement" where it is reasonable for terms to be left open subject to further negotiations or to see how other events develop.[85]  Here, it was reasonable for terms to be left open while Blacksands explored additional financing arrangements with other lenders and had not finalized its purchase of the oil field.

On the fourth factor, part performance, taking Blacksands' allegations as true, it repeatedly made attempts to discuss issuance of the RCF, including making multiple requests for a draft agreement that ICBC's counsel was to prepare.[86]  Where the agreement in question is to negotiate in good faith, actual attempts to begin or continue negotiations are sufficient to demonstrate part performance by Blacksands.

Lastly, the fifth factor  also weighs in favor of finding a binding Type II agreement because the BLA obligated them to negotiate in good faith towards subsequent financial transactions.

Accordingly, he Court holds that Blacksands has offered competent evidence sufficient to raise a genuine issue of material fact as to whether there was a binding Type II

---

[84] DI 23 ¶ 47 (Pl's Resp. To Def.'s Counter-Statement of Material Facts).

[85] *Brown*, 420 F. 3d at 158.

[86] DI 11 ¶¶ 32-44.

preliminary agreement to negotiate in good faith towards issuance of the RCF.  The inquiry does not end here, however, because a failure to reach a final deal does not necessarily mean that any party acted in bad faith and thus breached a Type II agreement.[87]  Instead, some deliberate misconduct is required, such as "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."[88]

Courts occasionally resolve questions of bad faith at the pleading stage. Nevertheless, "the question of whether a party acted in good faith typically is not suitable for resolution on a motion to dismiss."[89]

Here, Blacksands alleges that ICBC promised to provide a draft of the RCF during a November 26, 2013 conference call, but failed to do so despite repeated requests over the next several months[90] – a period spanning the entire time during which negotiations were to have continued.[91]  It has alleged also that ICBC failed to engage in substantive negotiations regarding the RCF despite repeated attempts to do so.[92]  At this early stage, this is sufficient to "nudge[] their

---

[87]

     *Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F. Supp.3d 373, 382 (S.D.N.Y. 2014) ("A party may abandon the transaction as long as it has made a good faith effort to close the deal . . . ." (internal quotations omitted)).

[88]

     *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y.1987)).

[89]

     *Gas Natural*, 33 F. Supp. 3d at 383.

[90]

     DI 11 ¶¶ 33-37.

[91]

     BLA § 10.11; DI 21 Ex. 1 (letter stating that final review by ICBC of RCF to be completed by maturity date of bridge loan).

[92]

     *Id.* ¶¶ 35-44.

claims [of bad faith] across the line from conceivable to plausible."[93]  Accordingly, the claim for breach of a Type II preliminary agreement is legally sufficient.[94]

B.    Second Cause of Action: Promissory Estoppel

To state a claim for promissory estoppel, a plaintiff must show: "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) injury sustained by the party asserting the estoppel by reason of his reliance."[95] Specifically, they allege that ICBC "promised to issue the RCF" and that Blacksands and Alpha Blue "relied on [ICBC]'s promise . . . , forgoing other loan opportunities that would have resulted in . . . closing on the acquisition of the oil field in the first half of 2014."[96]

As discussed above, however, beyond its bare assertions that the term sheet and

---

[93]

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007).

ICBC, in its Memorandum in Support of its Motion to Dismiss, includes a lengthy section in which it alleges several pages of additional facts that, it claims, "plainly contradict [Blacksands'] allegations." DI 25 at 4. However,"plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (second emphasis added). The Court therefore does not consider them on this motion.

[94]

The Court notes that lost profits are not available as a remedy for this claim; recovery is limited to out-of-pocket costs incurred in partial performance of good faith negotiations. L-7 Designs, Inc., 647 F.3d at 431. ("Although lost profits are not available where no agreement is reached, out-of-pocket costs incurred in the course of good faith partial performance are appropriate." (citing Goodstein Constr. Corp. v. City of New York, 80 N.Y.2d 366, 374 (1992); Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 74 n. 2 (2d Cir.1989))).

[95]

Cohen v. Lehman Bros. Bank, FSB, 273 F. Supp.2d 524, 529 (S.D.N.Y. 2003).

[96]

DI 11 ¶¶ 75-76.

November 15 emails constituted a binding agreement, Blacksands has offered no facts suggestive of an actual promise to issue the RCF.  The mere fact that ICBC was interested in negotiating towards final consummation of the RCF is insufficient to create an actual promise.[97]  In the absence of a promise, there can be no reliance or injury based on that promise.

C.      *Third Cause of Action: Unjust Enrichment*

Blacksands and Alpha Blue allege that ICBC was unjustly enriched by Alpha Blue's continued interest payments at the BLA-prescribed rate of LIBOR + 9.95 percent, rather than the lower interest rate of LIBOR + 4.5 percent they claim would have been in effect under the RCF.[98]

Under New York law, to state a claim for unjust enrichment, a party must allege: "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered."[99]  Unjust enrichment is a quasi-contract theory of recovery, "an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned."[100]  Recovery on a theory of unjust

---

[97]

       *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp.2d 423, 444 (S.D.N.Y. 2006) ("[A]bsent a distinct communication to be bound, a statement by one party to another that evinces the speaker's desire to consummate or further a commercial transaction does not constitute a clear and unambiguous promise.").

[98]

       DI 11 ¶¶ 81-86.  On the unjust enrichment claim, Blacksands and Alpha Blue claim only the interest payments made under the BLA, not damages on the full value of the RCF.  DI 11 ¶ 95(b).

[99]

       *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (internal quotations omitted).

[100]

       *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009).

enrichment, however, is unavailable "[w]here the parties executed a valid and enforceable written contract governing a particular subject matter."[101]

Here, there is a valid contract – the BLA – that governs the interest rate Alpha Blue owed to ICBC, including the interest owed in the event of a default.[102]  Blacksands argues that "[t]he fact that the interest payments induced by Plaintiff's promise to enter into the RCF were pursuant to the terms of another agreement is immaterial."[103]  It goes on to argue, in essence, that the BLA provides for interest payments only through February of 2014.[104]  Section 2.7(c) of the BLA provides specifically for a higher interest rate in the event of a default, however, clearly contemplating the possibility of interest payments extending beyond the loan's maturity date. Therefore, far from being unjustly enriched, ICBC merely received payments to which it was contractually entitled.

### D.    *Fourth Cause of Action: Fraudulent Misrepresentation*

#### 1.    *Blacksands Fails to State a Claim for Fraud*

The elements of fraud in New York are "(1) misrepresentation of a material fact; (2) scienter; (3) justifiable reliance; and (4) injury or damages."[105]  Furthermore, Federal Rule of Civil

---

[101]

*Id.*

[102]

BLA §§ 2.7(a), (c).

[103]

DI 28 at 18-19.

[104]

*Id.*

[105]

*P. Chimento Co. v. Banco Popular de Puerto Rico*, 208 A.D.2d 385, 385, 617 N.Y.S.2d 157, 158 (1st Dep't. 1994).

Procedure 9(b) imposes a heightened pleading requirement in cases alleging fraud.  "While Rule 9(b) allows mental states to be alleged generally, this relaxation of the heightened pleading requirement is not to be mistaken 'for a license to base claims of fraud on speculation and conclusory allegations. . . .  Plaintiffs must state facts sufficient to give rise to a strong inference of fraudulent intent."[106]

*Misrepresentation of a Material Fact.*  Blacksands alleges that ICBC made numerous misrepresentations concerning ICBC's intent to issue the RCF, which Blacksands argues were made "in an effort to induce [Blacksands] to continue making interest payments to Counter-Defendant."[107]  Blacksands further alleges that the "material misrepresentations and false statements were knowingly false and/or contained material omissions, in that [ICBC] knew that it had no intention to issue the RCF."[108]  The Court agrees to the extent that a knowing misrepresentation of an intention on the part of ICBC to issue the RCF would have constituted a misrepresentation of fact.[109]

*Scienter.*  Blacksands alleges three facts that it claims give rise to the requisite strong inference of intent: that ICBC (1) failed to draft the RCF after saying it would do so, (2) expressed hesitation to extend the RCF after learning that a Chinese company was interested in purchasing the

---

[106]

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 13 Civ. 1476, 2015 WL 4492258, at *13 (2d Cir. July 24, 2015) (internal citations and quotation marks omitted).

[107]

DI 11 ¶ 91.

[108]

DI 11 ¶ 92.

[109]

*E.g., In re Lehman Bros. Sec. and ERISA Litig.*, __ F. Supp.3d __, No. 09-md-2017 (LAK), 2015 WL 5514692, at *5-8 (S.D.N.Y. Sept. 18, 2015).

same oil field as Alpha Blue, and (3) "extended the [BLA]'s maturity date . . . based on its false promise that it would issue the RCF."[110]  But the argument is not persuasive.

First, Blacksands' allegation that ICBC promised to provide a draft RCF but failed to do so is not fraudulent without some indication that ICBC never intended to keep that promise. A broken promise, without more, is insufficient to raise a genuine issue as to fraud.[111]

Second, Blacksands points to ICBC's hesitation to issue the RCF after learning that another bidder, Goldleaf Jewelry, was interested in acquiring the same oil field, attempting to paint this hesitation in an ominous light by pointing out that both ICBC's parent company and Goldleaf Jewelry are Chinese-owned.[112]  Blacksands, however, does not provide a single fact that suggests any relationship between the two Chinese-owned companies, any conversation between them, or indeed, that they shared anything in common other than their nationality.  The mere fact of common nationality is not enough to give rise to a strong inference of fraud.

Third, Blacksands argues that the allegedly fraudulent statements were intended to induce Blacksands to make interest payments under the BLA.  Yet, at the point these statements were made, Blacksands already had signed the BLA.  It therefore was legally obligated to make all

---

[110]
      DI 28 at 19-20 (Counter-Pls.' Mem. in Opp'n to ICBC (London) Plc's Mot. to Dismiss Countercls.).

[111]
      *Miller v. Holtzbrinck Publishers, LLC*, No. 08 Civ. 3508, 2009 WL 528620, at *4 (S.D.N.Y. Mar. 3, 2009) *aff'd sub nom. Miller v. Holtzbrinck Publishers, L.L.C.*, 377 F. App'x 72 (2d Cir. 2010); *Lane v. McCallion*, 166 A.D.2d 688, 690, 561 N.Y.S.2d 273, 275 (2nd Dep't. 1990) ("Absent a present intent to deceive, a statement of future intentions, promises or expectations is not actionable as fraud.").

[112]
      *See, e.g.*, DI 28 at 20 ("What Plaintiff characterizes as an innocent remark seems at least as likely to be a tipping of its hand that it intended to favor a domestic Chinese company over Alpha Blue and Blacksands in a competition for acquisition of the California oil field . . . .").

required payments under the contract *before* any of the purported fraudulent statements were uttered. "[O]ne cannot be induced to tender a performance which is required as a part of a preexisting contractual obligation. . . . [A] plaintiff cannot claim to have been defrauded into doing what it already was legally bound to do."[113]   Accordingly, the three statements alleged to have been fraudulent do not raise a sufficiently cogent inference of intent to defraud, whether considered individually or collectively.

*Reliance*.  Blacksands claims that it reasonably relied on ICBC's alleged promise to issue the RCF by turning down other funding opportunities to purchase the oil field.   Reliance is not justified, however, where it is based upon an uncertain, uncommitted future action.[114]   Here, negotiations for the RCF were ongoing, as evidenced by the BLA itself and the November 26, 2013 teleconference.   Furthermore, Blacksands is a sophisticated business entity[115] engaged in negotiations with several financial institutions.[116]   Additionally, it was advised by counsel in negotiating the BLA.[117]   Because (1) negotiations were far from complete in finalizing the RCF, (2)

---

113

   *Megaris Furs, Inc. v. Gimbel Bros.*, 172 A.D.2d 209, 212, 568 N.Y.S.2d 581, 584 (1st Dep't. 1991) (citation omitted).

114

   *See Structure Tone, Inc. v. Niland*, 112 A.D.3d 505, 507, 977 N.Y.S.2d 228, 229 (1st Dep't. 2013) (finding reliance unreasonable where, among other factors, negotiations were ongoing).

115

   DI 11¶ 8 ("Blacksands is an international oil and gas corporation that, together with its subsidiaries, explores, produces, and sells crude oil, natural gas, natural gas liquids, and bitumen to customers in the United States and internationally.  The company also engages in the trading and marketing of crude oil and petroleum products, and offers oilfield services.").

116

   DI 11 ¶¶ 9-11.

117

   BLA § 10.15(a).

Blacksands is a sophisticated business presumably experienced in negotiating financing arrangements, and (3) it was advised by counsel, its reliance on any alleged promise to issue the RCF was not reasonable.

    2.    *The Fraud Claim in the Context of this Contract Action Fails as a Matter of Law*

As a final matter, "[i]t is well settled under New York law that a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations."[118]   However, "a valid fraud claim may be premised on misrepresentations that were made *before* the formation of the contract and that induced the plaintiff to enter the contract."[119]  In other words, any alleged misrepresentations that occurred after the formation of the contract cannot support a claim for fraud; only those that occurred before contract formation may be considered.

    Here, the only alleged statements that preceded the formation of the BLA were in the November 15, 2013 email chain between ICBC and its counsel at Jones Day, in which ICBC sought an estimate for the cost of drafting the BLA and a possible RCF.[120]  This email, though it supports the contention that ICBC was contemplating the possible issuance of the RCF, neither promised to do so nor, given Blacksand's allegations, may be regarded as having been fraudulent.

---

[118]

*Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616 (S.D.N.Y. 2003) (citing *International Cabletel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483, 486 (S.D.N.Y. 1997)) (emphasis added).

[119]

*Id.*

[120]

DI 11 ¶¶ 22-31; DI 12 Ex. 3 (November 15, 2013 email chain).

*Conclusion*

Plaintiff ICBC's motion for summary judgment against defendant The Blacksands Pacific Group, Inc. [DI 1-2] is granted in all respects.  It therefore shall have judgment against defendant for the principal sum of $5 million together with accrued interest, attorneys fees in accordance with the contract, and costs.  As this ruling fully disposes of plaintiff's claim against defendant, and the only aspect of the counterclaims asserted by defendant and counterclaimant Blacksands Pacific Alpha Blue, LLC is entirely independent of defendant's liability to plaintiff on the obligation that is the subject of plaintiff's claim against defendant, the Court determines that there is no just reason for delay and directs the Clerk, pursuant to Fed. R. Civ. P. 54(b), following the determination of attorneys' fees pursuant to Fed. R. Civ. P. 54(d)(2) and Local Civil Rule 54.1, to enter final judgment in favor of plaintiff and against defendant on plaintiff's affirmative claim against defendant.

Plaintiff ICBC's motion to dismiss the counterclaims against it [DI 24] is granted in all respects save that the motion is denied as to so much of the first cause of action as alleges breach of an alleged Type II preliminary agreement.

SO ORDERED.

Dated:        September 29, 2015

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)